WORRELL, APPELLEE AND CROSS-APPELLANT, *v.* MULTIPRESS, INC. ET AL, APPELLANTS AND CROSS-APPELLEES.

[Cite as Worrell *v.* Multipress, Inc. (1989), 45 Ohio St. 3d 241.]

242

(No. 88-535—Submitted April 5, 1989—Decided September 13, 1989.)

*Porter, Wright, Morris & Arthur, Charles J. Kurtz III* and *Emily J. Lewis,* for appellee and cross-appellant.

*Thompson, Hine & Flory, Thomas C. Scott, William R. Case, Barry L. Lubow* and *Judith A. Northrup,* for appellants and cross-appellees.

MOYER, C.J.  We observe at the outset that defendants do not appeal the appellate court's decision regarding the validity of the oral contract of employment. We therefore restrict our review to the damages awarded for the wrongful discharge, the transfer of stock, the jury instructions regarding libel, and the plaintiff's cross-appeal claiming that he was wrongfully denied prejudgment interest.

## I

First we consider whether plaintiff should have been denied recovery for defendants' breach of the oral contract to transfer ten percent of Multipress, Inc. corporate stock to him.

During the latter half of 1982, Worrell and Theodore P. Schwartz worked as promoters in obtaining an option for the purchase of a manufacturing business, the Multipress product line of the Denison Division of the Abex Corporation. Because they had no operating capital of their own, they sought financing from a number of banks and private investors. Finally, defendant Charles Grim agreed to provide approximately $700,000 of the necessary financing. In exchange, Grim demanded one hundred percent control and ownership of all the shares in the newly formed corporation—Multipress, Incorporated. Grim promised each man a position in the company as long as he performed satisfactorily, and agreed that both Worrell and Schwartz would each own ten percent of the stock of Multipress when the corporation was formed. Although plaintiff requested, and Grim agreed, that their agreement be reduced to writing, Grim never did so. Subsequently, Grim informed the men that it would be better not to place the stock in their names, but that he would hold the stock for them. The purchase of Denison Multipress was concluded in

November 1982, and Multipress, Inc. began operating with Worrell serving as president and Schwartz as executive vice president.

In July 1983, Grim decided to place Multipress stock for public sale and a draft of the stock prospectus was prepared which contained no mention of Worrell's and Schwartz's ownership interests. When Worrell and Schwartz complained to Grim, he made it clear that all he had to offer them was a job and asked whether they wanted to remain members of the team. Schwartz accepted, but Worrell asked to meet with the corporation's attorney regarding his stock ownership. In response, Grim fired Worrell.

The General Assembly adopted portions of Uniform Commercial Code ("UCC") 8-102 in R.C. 1308.01, which provides in pertinent part:

"(A)  As used in sections 1308.01 to 1308.44 of the Revised Code, unless the context otherwise requires:

"(1)  A 'certificated security' is a share, participation, or other interest in property of or an enterprise of the issuer or an obligation of the issuer which is:

"(a)  Represented by an instrument issued in bearer or registered form;

"(b)  Of a type commonly dealt in upon securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment[.]"

A review of cases in other jurisdictions reveals that UCC 8-102 specifically applies to the sale of such securities as are commonly traded in securities exchanges or markets or which are commonly dealt with as mediums of investment.[1] Furthermore, contracts for the sale or purchase of securities are covered by the Statute of Frauds pursuant to R.C. 1308.34,[2] and must be in writing to be enforceable. See *Riley* v. *Interep Associates, Inc.* (N.D. Ga. 1982), 533 F. Supp. 486, 487. The question therefore is whether the transaction under review here was a "sale" of securities.

Although "sale of securities" is not defined in UCC Chapter 8, UCC 2-106 (1) [R.C. 1302.01(A)(11)] provides that: "A 'sale' consists in the passing of title from the seller to the buyer for a price." Here the question can be resolved based on whether Grim's promise that ten percent of Multipress' stock would be transferred to Worrell constituted a "sale" as defined in the UCC. We think the promise to convey did not amount to a "sale." The arrangement between Grim and Worrell was one of promoter-investor. See *Henderson* v. *Joplin* (1974), 191 Neb. 827, 217 N.W. 2d 920; see, also, Annotation, Validity and Construction of Preincorporation Agreement between

---

[1] Official Comment to R.C. 1308.01 (UCC 8-102) reads in part: "On the other hand the definition [of securities] does not cover anything * * * which is not either 'of a type commonly dealt in upon securities exchanges or markets,' or 'commonly recognized * * * as a medium for investment.' "

[2] "UCC 8-319, Statute of Frauds, reads:

"A contract for the sale of securities is not enforceable by way of action or defense unless:

"(a)  there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker, sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price * * *." See *Baldassarre* v. *Singer* (1971), 444 Pa. 100, 282 A. 2d 262; *Burns* v. *Gould* (1977), 172 Conn. 210, 374 A. 2d 193; *Bowers Steel, Inc.* v. *DeBrooke* (Tex. Civ. App. 1977), 557 S.W. 2d 369; *Koman* v. *Morrissey* (Mo. 1974), 517 S.W. 2d 929; *Hiller* v. *Franklin Mint, Inc.* (C.A. 3, 1973), 485 F. 2d 48, 51.

Promoters as to Future Employment (1976), 66 A.L.R. 3d 1138 (preincorporation agreements between promoters regarding employment and stock division will generally be honored absent a showing of fraud or bad faith between the parties).

Grim agreed to provide financing for the purchase of Denison Multipress as negotiated by Worrell and Schwartz with Abex Corp. The negotiations between Grim and Worrell and Schwartz resulted in eighty percent ownership for Grim and twenty percent ownership for Worrell and Schwartz in the new corporation. No price or fee was to be forthcoming, either immediately or at a future date, from either party in exchange for the ownership interest in the newly formed corporation. Had Grim's promise been for an option to purchase the stock in the future for a price, the contract would have been subject to the writing requirement of the Statute of Frauds pursuant to R.C. 1308.34. See *Mildfelt* v. *Lair* (1977), 221 Kan. 557, 561 P. 2d 805; *Quinn* v. *Beverages of West Virginia, Inc.* (W.Va. 1976), 224 S.E. 2d 894; *Scarpinato* v. *National Patent Development Corp.* (S. Ct. 1973), 75 Misc. 2d 94, 347 N.Y. Supp. 2d 623. We hold that an oral promise to convey stock which does not require payment of a price, either immediately or as an option for purchase in the future, is not a "sale of securities" within the meaning of R.C. 1308.34, and such oral promise to convey is an enforceable agreement not subject to the Statute of Frauds.

Because we find that no "sale" was contemplated as part of the agreement between Grim and Worrell, we reverse the court of appeals to the extent that this transaction was not for the sale of securities. We therefore need not reach the question of whether promissory estoppel removes this transaction from the Statute of Frauds' writing requirement. The award of damages for breach of the contract to transfer the stock is affirmed.

Defendants do not appeal the amount of damages awarded plaintiff. The stock of a closely held corporation that is not listed on an exchange and has no public market may be valued by what a willing buyer " 'would pay to a willing seller who was not acting under compulsion.' " (Citation omitted.) *Bowers Steel, Inc.* v. *DeBrooke, supra,* at 373; see, also, *Equity Investors, Inc.* v. *Academy Insurance Group, Inc.* (1981), 229 Kan. 456, 625 P. 2d 466, for an alternate method of valuation. The record indicates that Grim was unable to place the stock on the public market and no other "sales" were made to third parties. Although there are numerous exhibits and testimony in the record dealing with the value of Multipress, Inc., the only substantial testimony relating to the value of the stock was that offered by Schwartz. He stated that Grim gave him for no remuneration ten percent of the corporate stock, and Schwartz estimated its worth at approximately $300,000. The measure of damages here places Worrell in the same position he would have been in had no breach occurred. *Desnick* v. *Mast* (1976), 311 Minn. 356, 249 N.W. 2d 878. In view of the fact that defendants presented no ascertainable alternative valuation, the damages award stands as determined by the jury.

## II

Defendants do contest, however, the damages awarded for breach of the employment contract. Specifically, defendants contend that the front pay, or future wages, allegedly lost by plaintiff as a result of the wrongful discharge are highly speculative and excessive in

view of plaintiff's subsequent periods of employment.

At the outset we note that the usual remedy in breach of contract cases for wrongful discharge is to pay the injured party the difference between any wages due under the contract from the date of discharge until the contract term expires, and that amount is to be reduced by any wages the employee earned in subsequent employment. See Dobbs, Law of Remedies (1973) 924-925, Section 12.25; *Bramhall* v. *ICN Medical Laboratories, Inc.* (1978), 284 Ore. 279, 586 P. 2d 1113.

The jury awarded $500,000 in damages without designating what portion was considered back pay as compensation for the period between discharge and the date of trial, and what portion was considered front pay. However, Worrell sought compensation for wages lost in 1983 and 1984 amounting to $74,383. The court of appeals properly affirmed this portion of the award.[3] The court reduced the front-pay award to $244,183 based on the expectancy that plaintiff would have continued to work until age sixty-five with a continued loss of $25,000 per year, but reduced to present value.

"Front pay" is the term given to the remedy created under federal statutory authority to compensate wrongfully discharged employees under the Age Discrimination in Employment Act of 1967 ("ADEA"), Section 626(b), Title 29, U.S. Code. See *Goldstein* v. *Manhattan Industries, Inc.* (C.A. 11, 1985), 758 F. 2d 1435; *Davis* v. *Combustion Engineering, Inc.* (C.A. 6, 1984), 742 F. 2d 916. The remedy has not been granted consis-

tently as some federal courts do not permit a discharged employee to recover front pay under any circumstances. See *Kolb* v. *Goldring, Inc.* (C.A. 1, 1982), 694 F. 2d 869; *Monroe* v. *Penn-Dixie Cement Corp.* (N.D. Ga. 1971), 335 F. Supp. 231. But from our review of the decisions of those courts that have permitted the award of front-pay damages, several points are clear.

First, front pay is an equitable remedy designed to financially compensate employees where "reinstatement" of the employee would be impractical or inadequate. In such circumstances an award of front pay enables the court to make the injured party whole, although reinstatement is the preferred remedy. See *Cassino* v. *Reichhold Chemicals, Inc.* (C.A. 9, 1987), 817 F. 2d 1338, certiorari denied (1988), 484 U.S. ____, 98 L. Ed. 2d 870, 108 S. Ct. 785; *Maxfield* v. *Sinclair Internatl.* (C.A. 3, 1985), 766 F. 2d 788, certiorari denied (1986), 474 U.S. 1057; *O'Donnell* v. *Georgia Osteopathic Hosp., Inc.* (C.A. 11, 1984), 748 F. 2d 1543. Second, as an equitable remedy, it is left to the sound discretion of the trial court to determine whether front pay is appropriate under the circumstances of the case. If it is determined that front pay is an appropriate remedy, then the jury should determine the amount of damages. *Hansard* v. *Pepsi-Cola Metro. Bottling Co.* (C.A. 5, 1989), 865 F. 2d 1461, 1470. Third, it is apparent that front-pay damages are temporary in nature, as they are designed to assist the discharged employee during the transition to new employment of equal or similar status. *Cassino* v. *Reichhold*

---

[3] The award of back pay for lost earnings given for the period between discharge and either reinstatement or time of trial must be reduced by any income the employee earned. See *Smith* v. *Atlas Off-Shore Boat Service, Inc.* (S.D. Miss. 1982), 552 F. Supp. 128.

*Chemicals, Inc., supra,* at 1347; *Bailey v. Container Corp. of America* (S.D. Ohio 1986), 660 F. Supp. 1048, 1055.

Because front pay is intended to assist the discharged employee to find comparable employment, we agree with those courts that have refused front pay as a matter of right for long-term compensation from the date of discharge until some anticipated retirement date. Front pay should be awarded for an interim period in circumstances where the discharged employee has employable and productive years ahead. See *Foit* v. *Suburban Bancorp.* (D. Md. 1982), 549 F. Supp. 264, 267; *Monroe* v. *Penn-Dixie, supra,* at 235; *Snow* v. *Pillsbury Co.* (D. Minn. 1986), 650 F. Supp. 299, 300; but, see, *Stark* v. *Circle K Corp.* (Mont. 1988), 751 P. 2d 162 (court upheld award of front pay to discharged employee until anticipated retirement, for a total of twenty-eight years' lost income).

Plaintiff did not plead age discrimination as the basis for his wrongful discharge, and the issue is therefore what standard should be used in determining damages for breach of an employment contract. We conclude that limiting the award of front pay to the interim period between discharge and subsequent employment is consistent with those damages ordinarily awarded in such circumstances. We hold that, as a result of breach of an employment contract where an employee has been wrongfully discharged, front pay, or lost future wages, may be awarded as compensation between the date of discharge and reemployment in a position of equal or similar status. Our decision today does not restrict the award of front pay for a more extended period of time in age discrimination suits filed pursuant to R.C. Chapter 4112, Civil Rights Commission.

Among the factors to be considered in determining damages for lost future wages where an employee has been wrongfully discharged are (1) the age of the employee and his or her reasonable prospects of obtaining comparable employment elsewhere[4]; (2) salary and other tangible benefits,[5] such as bonuses and vacation pay; (3) expenses associated with finding new employment[6]; and (4) the replacement value of fringe benefits, such as an automobile and insurance for a reasonable time until new employment is obtained.[7]

Approximately one month after discharge from Multipress, Inc., in September 1983, Worrell accepted a position as a consultant paid on a monthly basis for work performed with Walter Leukart, Jr., AMPSCO, where he remained until January 1985. He then went to work for Michael Industries in Newark, Ohio, on a project to set up a new plant for manufacturing barbed wire. That employment lasted until March 1, 1986. Although both of these positions were apparently intended as short-term employment, Worrell earned $71,400 in 1985.

Worrell subsequently searched for but was unable to obtain a new position

---

[4] *Dominic* v. *Consolidated Edison Co. of New York, Inc.* (S.D.N.Y. 1986), 652 F. Supp. 815, 819; see Annotation, Damages Recoverable for Wrongful Discharge of At-Will Employee (1986), 44 A.L.R. 4th 1131.

[5] See *Nordquist* v. *Uddeholm Corp.* (D. Conn. 1985), 615 F. Supp. 1191, 1204.

[6] See *Smith* v. *Atlas Off-Shore Boat Service, Inc., supra.*

[7] See *Potter* v. *Village Bank of New Jersey* (1988), 225 N.J. Super. 547, 543 A. 2d 80, certiorari denied (1988), 113 N.J. 352, 550 A. 2d 462.

after his work with Michael Industries ended, and he remained unemployed at the time this cause went to trial in June 1986.

Applying the law announced herein to the facts of this case, we reverse the court of appeals as to the issue and remand the cause to the trial court to determine whether financial compensation in the form of lost future wages is an appropriate remedy under the circumstances of this case. If it is determined to be a proper remedy, the jury must be given criteria, as discussed above, upon which to calculate the awards. Any award of front pay should be set off, or reduced, by any earnings Worrell accrued after 1984.

III

The libel charge in plaintiff's complaint was based on a prospectus prepared and circulated to potential brokers for the purpose of placing Multipress, Inc. stock on the market for sale to the public. Because Worrell had been discharged shortly before release of the prospectus, it was necessary to mention the vacancy or absence of a "president" in the corporation. The attorneys preparing the prospectus for defendants drafted language to be added in the document, stating that plaintiff had been terminated due to unsatisfactory performance. Defendant Grim verified that this was acceptable to him.

Defendants argue that because the statement regarding Worrell's discharge was made at the insistence of counsel in order to meet disclosure requirements under federal securities laws, defendants were protected by a qualified privilege as a matter of law, see *Miller* v. *Lear Siegler, Inc.* (D. Kan. 1981), 525 F. Supp. 46, and that the trial court erred by submitting as an issue to the jury the existence of a qualified privilege. They argue further

that the trial court compounded the error by instructing the jury that the privilege could be lost if the alleged defamatory statement was made because of personal feelings of ill will.

We stated in paragraph two of the syllabus in *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237, 72 O.O. 2d 134, 331 N.E. 2d 713, that: "A qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with 'actual malice,' that is, with knowledge that the statements are false or with reckless disregard of whether they are false or not."

The trial court instructed the jury as follows: "A publication is made with actual malice when made with the knowledge that it is false or with reckless disregard of whether it is false or not." The language of which defendants complain is found in the jury instructions regarding punitive damages, in which the trial court stated: "Punitive damage[s] may be awarded only where a party intentionally and with actual malice injured another, without lawful justification or excuse. Actual malice means anger, hatred, ill will, a spirit of revenge, or reckless disregard of the consequences or the legal rights of others."

The trial court did not err in defining "actual malice" with regard to the publication. The more critical question is whether the court submitted the existence of a qualified privilege to the jury and, if so, whether it constituted reversible error under the circumstances.

In *Mauk* v. *Brundage* (1903), 68 Ohio St. 89, 67 N.E. 152, paragraph two of the syllabus, and *Becker* v. *Toulmin* (1956), 165 Ohio St. 549, 554, 60 O.O. 502, 504-505, 138 N.E.2d 391, 395, we held that "* * * where the publication is claimed to be privileged the question whether or not the occa-

sion gives the privilege * * * is also for the court." It is for the trial court to determine as a matter of law whether a privilege exists as a defense to the alleged defamation. However, once the existence of privilege has been decided, the defense may be lost if the plaintiff proves that the defamatory statement was made with "actual malice" as defined in *Hahn.* See *Varanese* v. *Gall* (1988), 35 Ohio St. 3d 78, 518 N.E. 2d 1177, certiorari denied (1988), 487 U.S. ____, 101 L. Ed. 2d 886, 108 S. Ct. 2849.

The jury found that Grim acted with actual malice in stating in the stock prospectus that Worrell had been removed as president due to his failure to adequately perform his duties. In view of the jury's finding that actual malice existed, we agree with the court of appeals that any error committed by the trial court in submitting the question of privilege to the jury was rendered harmless. We affirm the judgment below in this respect.

## IV

Finally, we turn our attention to plaintiff's cross-appeal requesting that an award of prejudgment interest be given pursuant to R.C. 1343.03.

We note that in his brief to this court, plaintiff asks that we grant his request for prejudgment interest based on both the breach of employment contract and breach of contract to convey stock, as well as the award for libel. The transcript of the hearing conducted on October 9, 1986, however, shows that plaintiff only requested prejudgment interest for libel and for breach of the contract to convey stock. We therefore consider any request made on the employment contract to have been waived.

Prejudgment interest is not available pursuant to R.C. 1343.03(A) unless there is an amount due and payable, or a claimed amount due is capable of ascertainment by computation or reference to well-established market values at the time the cause of action arose. See *Mahon-Evans Realty, Inc.* v. *Spike* (1986), 33 Ohio App. 3d 268, 515 N.E. 2d 953; *Shaker Savings Assn.* v. *Greenwood Village* (1982), 7 Ohio App. 3d 141, 7 OBR 184, 454 N.E. 2d 984.

At the time settlement offers were exchanged between the parties, there was no sum certain due on any of the breach-of-contract claims. It was uncertain whether Worrell had been wrongfully discharged or whether the oral contract to convey stock was an enforceable agreement. No value had been established for the stock, as it was neither sold to third parties for a price nor listed on the public market. Therefore, damages could not be ascertained by mere computation or by reference to market values until a determination on those issues was settled in court proceedings. Prejudgment interest was properly denied pursuant to R.C. 1343.03(A).

Plaintiff asserts, however, that he should have been awarded prejudgment interest under division (C) of the statute, claiming that there is no competent evidence in the record to support the trial court's conclusion that defendants rationally evaluated their potential liability and responded in good faith to plaintiff's reasonable settlement offers.

In fact, the trial court order states in relevant part: "The evidence is in conflict on whether the defendants made even a nuisance offer, but for the purposes of this order, the court will assume they did not make a nuisance offer of settlement. Failure to make an offer, by itself, is not evidence of a failure to make a good faith effort to settle. If a party has a good faith, objectively reasonable belief that he has

no liability, he need not make a monetary settlement offer; *Kalain* v. *Smith* (1986), 25 Ohio St. 3d 157 [25 OBR 201, 495 N.E. 2d 572]."

It is within the sound discretion of the trial court to determine "whether a party's settlement efforts indicate good faith." *Kalain* v. *Smith, supra,* at 159, 25 OBR at 203, 495 N.E. 2d at 574. The issues of law and fact posed in this case were complex and, to some extent, unsettled before trial, such that a ruling favoring defendants could have resulted in no liability on one· or all the issues. Based on the record, we conclude that the trial court did not abuse its discretion in denying prejudgment interest pursuant to R.C. 1343.03(C), and we therefore affirm the judgment of the court of appeals.

### V

For the reasons stated above, we affirm the court of appeals on the issues of breach of contract to convey stock, libel, and prejudgment interest. We reverse the court of appeals and remand the cause to the trial court, however, for a determination of proper damages to be awarded plaintiff for breach of the employment contract under the guidelines set forth in this opinion.

*Judgment affirmed in part, reversed in part and cause remanded.*

SWEENEY, HOLMES, WRIGHT, H. BROWN and SHAW, JJ., concur.

DOUGLAS, J., concurs in part and dissents in part.

STEPHEN R. SHAW, J., of the Third Appellate District, sitting for RESNICK, J.

DOUGLAS, J., concurring in part and dissenting in part. I find the Chief Justice's majority opinion to be well-reasoned and I concur in the syllabus, but I must dissent from the judgment to remand to the trial court to reconsider the future damages portion of the damages award for breach of the employment contract.

I believe when Judge McCormac and the court of appeals calculated future damages for the appellants' breach of Worrell's contract of employment to be $244,183 instead of the $500,000 granted by the jury, the court considered the majority's four factors for determining damages for lost future wages.

In now remanding, the majority seeks to have a new jury take another look at this portion of the award requiring, in effect, the new jury to do just what both the original jury and the court of appeals did in reaching their respective decisions. This prolongs the case unnecessarily and promises only to waste precious court time and resources. To avoid these consequences, I believe that this court should affirm the court of appeals' decision in all respects.