ZIMMERMAN; Sherer et al., Appellees and Cross–Appellants,

v.

EAGLE MORTGAGE CORPORATION et al., Appellants and Cross–Appellees.

[Cite as *Zimmerman v. Eagle Mtge. Corp.* (1996), 110 Ohio App.3d 762.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 15326, 15329.

Decided May 3, 1996.

764

766

*Terry Lewis*, for appellees and cross-appellants.

*Carl A. Cramer*, for appellants and cross-appellees.

FAIN, Judge.

Defendants-appellants and cross-appellees Eagle Mortgage Corporation ("Eagle") and Paul David Musgrave appeal from a judgment of the trial court in which $9,708.14 was awarded to plaintiff-appellee and cross-appellant Thomas C. Peterangelo and the sums of $21,101.11 and $125 were awarded to plaintiff-appellee and cross-appellant Kevin Schilling. Eagle and Musgrave contend that the judgment in favor of Peterangelo and Schilling is against the manifest weight of the evidence and is contrary to law. Specifically, Eagle contends that it did not breach its employment agreements with Peterangelo and Schilling when it terminated them, and that any issues regarding compensation for their services were controlled by their employment agreements. Further, Eagle contends that the trial court did not correctly calculate Peterangelo's and Schilling's damages and improperly awarded Peterangelo a judgment for a bonus referenced in his employment agreement. Finally, Eagle and Musgrave contend that the trial court erred by piercing Eagle's corporate veil and holding Musgrave, its sole shareholder, personally liable.

Plaintiff-appellees and cross-appellants Doug Sherer, Peterangelo, and Schilling cross-appeal from various judgments of the trial court. Specifically, they contend that the trial court erred in its calculation of "front pay" for Peterangelo and Schilling. Also, they contend that, contrary to the trial court's conclusion, Eagle's deductions of expenses from their paychecks were improper in light of ambiguities found in their employment contracts. Further, Sherer, Peterangelo, and Schilling contend that the trial court erred by placing upon them the burden of proof in showing that Eagle's payroll deductions were improper. Finally, they

appeal from the trial court's conclusion that Eagle did not wrongfully discharge Sherer.

We conclude that there is ample evidence to support the trial court's findings and conclusions with respect to Eagle's and Musgrave's assignments of error. Accordingly, those assignments of error are overruled.

With respect to Sherer's, Peterangelo's, and Schilling's assignments of error, although we do not find their other assignments of error to be well taken, we agree with them that the trial court erred by imposing upon them the burden of proving that Eagle's expense deductions from their paychecks were improper. Accordingly, the judgment of the trial court is reversed, and this cause is remanded for the trial court to determine the validity and amount of deductions made by Eagle from Sherer's, Peterangelo's, and Schilling's paychecks in light of the terms in their employment agreements, with the burden of proof falling upon Eagle and Musgrave to show that each deduction was proper.

# I

Eagle Mortgage Corporation was incorporated on November 21, 1990, to engage in the business of originating residential mortgage loans. Mark Zimmerman, Doug Sherer, Thomas C. Peterangelo, Kevin Schilling, and Brenda McComb were all Loan Officers of Eagle Mortgage Corporation, whose President and sole shareholder was Paul David Musgrave. As employees, they all signed employment agreements of similar length and content except for the range of compensation, which varied between salary, salary with commission, full commission, and full commission with annual bonus. Among the provisions contained in the agreements were the following:

"V. Term: Termination

"A. The term of this Agreement shall be one year. Thereafter, it shall automatically renew for periods of one year unless one Party has given the other written notice of its or his intent to terminate at least sixty days prior to the expiration of the then current term.

"B. In addition, Eagle Mortgage Corporation may terminate this agreement immediately upon the occurrence of any of the following:

"(1) Failure of Employee to indemnify Eagle Mortgage against any loss or claim by Employee.

"(2) Death or disability of Employee.

"(3) The creation or attempted creation of Employee of any liability, contractual or otherwise, on the part of Eagle Mortgage Corporation, except incidental charges incurred in the ordinary course of business.

"(4) Habitual or willful failure of Employee to perform his/her duties hereunder.

"(5) Any other material breach of this Agreement by Employee.

"C. Eagle Mortgage Corporation may terminate this agreement at any time. The Loan Officer may terminate this agreement at any time upon 14 days written notice to Eagle Mortgage Corporation."

With respect to the deduction of expenses by Eagle from the Loan Officers' paychecks, the employment agreements set forth the following provisions[1]:

"III. Compensation

"* * *

"E. The Loan Officer shall have compensation reduced based upon Addendum A, Paragraph 4.

" * * *

"G. Any dispute of compensation or other incentive issue must be received in writing by Eagle Mortgage Corporation within 30 days of payment. Unless such notice is timely given, payment shall be determined sole and final satisfaction of all claims for any and all remuneration due. Written notice must be provided to the President or Vice President of Eagle Mortgage Corporation.

"Addendum A

" * * *

"4. Unapproved Discount Concession:

"Compensation will be reduced by amount of shortage, pursuant to Section III, Paragraph E of Employment Agreement on a monthly basis.

" * * *

"IX. Indemnity by Employee

"The Loan Officer agrees to indemnify at his/her own expense and hold Eagle Mortgage Corporation harmless from and against any and all claims, demands, cause of actions, loss, or damage including reasonable attorney fees arising from employees acts or omissions, including without limitation, any breach of this

---

1. McComb's and Peterangelo's employment agreements contain an internal inconsistency in that Section III, Paragraph D refers to the reduction of compensation based upon Addendum A, Paragraph 4, which sets forth salaries and additional compensation. Upon comparison with the other loan officers' employment agreements, the correct reference appears to be to Addendum A, Paragraph 3, which sets forth reductions for unapproved discount concessions. At trial, the parties stipulated that all of the employment agreements were identical except for the rate of compensation and bonus provisions. Accordingly, we construe this inconsistency as a typographical error with no impact upon our decision.

agreement and any representations to prospective borrowers or other third parties."

At some point during 1992, Eagle began deducting amounts from its loan officers' paychecks for expenses that, from Eagle's perspective, were the result of the loan officers' failure to collect fees from the customer. As a result of these deductions and other dissatisfactions, Sherer resigned from Eagle on December 3, 1992, and Zimmerman resigned on January 14, 1993. Although the reasons are in dispute, Peterangelo was terminated by Eagle on December 15, 1992, and Schilling was terminated thereafter on January 30, 1993.

As the sole shareholder and president of Eagle, Musgrave exercised complete control over the corporation. After the initial incorporation of Eagle, Musgrave chose not to hold any shareholder or director meetings of the company, whether annual or otherwise. On numerous occasions, Musgrave disbursed corporate assets to himself for personal use and later claimed them as dividends without corporate declaration. Moreover, corporate officers were appointed and replaced by Musgrave without the knowledge of the individual being appointed or replaced.

On June 3, 1993, Zimmerman, McComb, Sherer, Peterangelo, and Schilling filed a complaint in the Common Pleas Court of Montgomery County against Eagle, Musgrave, and his wife, Barbara.[2] Soon thereafter, Musgrave began depleting the assets of Eagle. Eagle's balance sheet as of December 31, 1993, prepared by an independent accountant, showed Eagle's cash on hand at $102,966 and furniture and equipment at $102,293. By April 6, 1994, the same independent accountant estimated Eagle's cash on hand at $7,512 and furniture and equipment at $19,000. Moreover, Eagle's largest asset, Musgrave's personal note payable to Eagle in the amount of $320,850, was converted into a dividend by Musgrave in early 1994 and written off Eagle's books. In sum, Eagle's assets were reduced from $579,282 to $48,512 in less than four months, thereby rendering the company insolvent. At the time of trial, Eagle was not conducting business and was in the process of liquidating its remaining assets.

A bench trial was held from January 30 through February 2, 1995. After hearing exhaustive testimony from both parties, the trial court held that (1) Zimmerman and Sherer had suffered no damages; (2) Schilling was entitled to $21,101.11 for thirty weeks of front pay and $125 for money owed to him by Eagle on a computer lease; (3) Peterangelo was entitled to $9,708.14 for four weeks of front pay, unpaid commission, and his 1992 bonus; and (4) Eagle was

---

2. Barbara Musgrave's motion for summary judgment was sustained on September 14, 1994, and she was dismissed from the action. Likewise, McComb's sexual harassment claim was bifurcated for a separate trial.

entitled to $1,350 from Schilling for the breach of an agreement with Eagle for the use of a cellular telephone. Moreover, the court found that Musgrave had exercised such complete control over Eagle and in such an improper manner as to commit an illegal act against the plaintiffs, thereby warranting the piercing of the corporate veil, resulting in Musgrave's personal liability to the plaintiffs.

From the judgment of the trial court, Eagle and Musgrave appeal, and Sherer, Peterangelo, and Schilling cross-appeal.

## II

Eagle's first and second assignments of error are as follows:

"The judgment of the trial court is not sustained by the evidence and is against the manifest weight of the evidence.

"The judgment of the trial court is contrary to law."

In determining whether a judgment is against the manifest weight of the evidence, any competent, credible evidence addressing all of the essential elements of the case will suffice to sustain the judgment. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 261–262, 376 N.E.2d 578, 579. This court is guided by the presumption that the findings of the trial court—as the trier of fact—are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276. Eagle and Musgrave set forth their two assignments of error for each of the five "issues" set forth below.

## A

Eagle's and Musgrave's foremost contention is that the trial court erred in holding Musgrave personally liable for Peterangelo's and Schilling's claims by piercing the corporate veil. Eagle and Musgrave suggest that the three-part test set forth in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Co., Inc.* (1993), 67 Ohio St.3d 274, 289, 617 N.E.2d 1075, 1086–1087, precludes the trial court from holding Musgrave personally liable because he did not exercise such control over Eagle as to perpetrate a fraud or illegal act against Peterangelo or Schilling.

A corporation is a separate legal entity from its shareholders even where there is only one shareholder in the corporation. *Ferguson v. Strader* (1994), 94 Ohio App.3d 622, 628, 641 N.E.2d 728, 731–732; *LeRoux's Billyle Supper Club v. Ma* (1991), 77 Ohio App.3d 417, 420, 602 N.E.2d 685, 687–688. Nevertheless, the corporate fiction may be disregarded when:

(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own,

(2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and

(3) injury or unjust loss resulted to the plaintiff from such control and wrong. *Belvedere Condominium Unit Owners' Assn.*, 67 Ohio St.3d at 289, 617 N.E.2d at 1086.

■ The burden of proof lies upon the party seeking to impose individual liability on the shareholder. *LeRoux's Billyle Supper Club*, 77 Ohio App.3d at 423, 602 N.E.2d at 689–690.

■ The record is uncontroverted that Musgrave was the sole stockholder and director of Eagle and, as such, exercised complete control over Eagle's corporate affairs. The more contentious issue, however, is whether Musgrave's control was exercised in such a manner as to commit fraud or an illegal act against Peterangelo and Schilling. In view of the record, the trial court had sufficient competent and credible evidence to support its finding that Musgrave perpetrated a fraudulent act against Peterangelo and Schilling.

Testimony by Michael Stover, Eagle's independent accountant, and several trial exhibits show that Musgrave withdrew most of the assets of Eagle for his own personal use within ten months after this lawsuit was filed, thereby forcing Eagle into insolvency. The record is notably silent as to any explanation for Musgrave's decision to withdraw such a substantial portion of Eagle's assets within that time period. Accordingly, there was sufficient evidence for the trial court to conclude that Musgrave's decision was related to the pending lawsuit, to which Peterangelo and Schilling were parties.

The Ohio Uniform Fraudulent Transfers Act mandates that any transfer of assets by a debtor is fraudulent as to a creditor if the debtor made the transfer with the actual intent to hinder, delay, or defraud the creditor, even if the claim of the creditor arose after the transfer. R.C. 1336.04(A). Actual intent to defraud a creditor is determined by considering factors including, but not limited to (1) whether the transfer was to an insider, (2) whether before the transfer was made, the debtor had been sued, (3) whether the transfer was of substantially all of the debtor's assets, (4) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred, and (5) whether the debtor became insolvent shortly after the transfer was made. R.C. 1336.04(B). In applying these factors, a court may look to inferences from the circumstances surrounding the transaction:

"In determining whether a conveyance is made with actual intent to hinder, delay, or defraud a creditor, direct evidence of fraudulent intent is not essential and, indeed, in most circumstances, not likely to be available. Consequently, certain traditionally designated 'badges' or indicia of fraud, circumstances which usually or frequently attend a conveyance designed to hinder, delay, or defraud creditors, in concert with other suspicious circumstances, have generally been held to be sufficient to show fraud and invalidate the transfer of property." *Spangler v. Redick* (1991), 74 Ohio App.3d 798, 804, 600 N.E.2d 720, 724; *McKinley Fed. S. & L. v. Pizzuro Ent., Inc.* (1990), 65 Ohio App.3d 791, 796, 585 N.E.2d 496, 499–500; *In re Poole* (Bankr.Ct.N.D.Ohio 1981), 15 B.R. 422.

Based upon these factors and permissible inferences, we conclude that there is sufficient evidence in this record from which the trial court could find that the transfer of Eagle's assets by Musgrave constituted an intentional act to defraud the plaintiffs in this lawsuit by depleting the value of the company to such a degree that any judgment awarded to Peterangelo and Schilling could not be satisfied. Accordingly, the trial court's holding is supported by competent and credible evidence and is consistent with Ohio law.

## B

Eagle and Musgrave (collectively, "Eagle") contend that the trial court's holding that Peterangelo and Schilling were wrongfully discharged is against the manifest weight of the evidence and contrary to law. Eagle argues that the employment agreements, pursuant to Section V, Paragraph C, permit Eagle to terminate its employees at any time and for any reason. Further, Eagle suggests that Peterangelo and Schilling failed to take any loan applications for over six weeks prior to their discharge and, therefore, were terminated for cause under Section V, Paragraph B, No. 4, of the agreements, which permits termination for "habitual or willful failure of Employee to perform his/her duties."

Peterangelo and Schilling contend that the employment agreements are ambiguous in that Section V, Paragraph C, conflicts with Section V, Paragraphs A and B, which establish a one-year term of employment and set forth specific acts that may lead to immediate termination.

Unlike an at-will employment relationship, an employer who is a party to an employment contract of definite term may properly discharge the employee only for "just cause." *Beckman v. Garrett* (1902), 66 Ohio St. 136, 141–142, 64 N.E. 62, 62–63; *Dayton Rubber Mfg. Co. v. Brown* (1927), 116 Ohio St. 373, 374, 156 N.E. 136, 137; *Hosking v. Hollaender Mfg. Co.* (1961), 114 Ohio App. 70, 72, 17 O.O.2d 339, 340, 175 N.E.2d 201, 203. Eagle admitted to the trial court that

the employment agreement established a just-cause relationship which could only be terminated by Eagle for the infractions set forth in Section V, Paragraph B:

"THE COURT: What's the defendant's position with the language in paragraph C?

"MR. CRAMER: I never thought it was a critical issue.

"THE COURT: Set aside—

"MR. CRAMER: Number two, it is not ambiguous; it's contradictory.

"THE COURT: Contradictory?

"MR. CRAMER: As I understand contract construction, hornbook law, ambiguities are to be construed against the scrivener, and I don't think that means contradictions are to be construed against the scrivener. You give me a ten-page contract, you are bound to find something contradicts a later provision. I think the paragraph C sentence, since it's one of the shortest sentences that Harwood put into this contract, it's only about five words long, clarifies this contract, because it simply says Eagle Mortgage Corp. may terminate this agreement at any time.

"THE COURT: Is it your—

"MR. CRAMER: It's clarifying.

"THE COURT: Is that with or without cause?

"MR. CRAMER: No, with cause.

"THE COURT: So, even if they can do it at any time within the year or the one year renewable, they would still have to go back to B and find a reason?

"MR. CRAMER: Clearly."

Eagle's admission obviates the need for this court to interpret the employment agreement to determine whether, as now suggested by Eagle, Section V, Paragraph C, permits Eagle to terminate Peterangelo and Schilling for any reason.

■ With regard to Section V, Paragraph B, we find ample evidence to support the trial court's conclusion that Peterangelo and Schilling were not terminated for just cause. In determining just cause, the established rule is that "the employer may discharge for misconduct whose necessary tendency is to the injury of his business." *Beckman*, 66 Ohio St. at 142, 64 N.E. at 63. While Section V, Paragraph B, does set forth various acts that constitute just cause, there is competent and credible evidence showing that Peterangelo and Schilling were terminated for less than just cause.

■ Eagle asserts that Peterangelo and Schilling habitually failed to perform their duties by neglecting to take new loan applications for at least six weeks

prior to their discharge. There is testimony, however, that Peterangelo and Schilling were working on numerous mortgage loan applications in their "pipeline" prior to their terminations and that one of Peterangelo's loans closed the very day he was discharged. Also, there is testimony showing that Musgrave discharged Peterangelo after several discussions regarding the amount of Peterangelo's annual bonus and that Musgrave, after promising Peterangelo that he would honor the estimated $4,972.50 bonus, later attempted to settle the amount for $90.25. Further, the trial testimony indicated that Musgrave offered Schilling a promotion to office manager only two and a half weeks prior to Schilling's termination, and that after Schilling was terminated, Musgrave told another employee that he wanted to get rid of the old group and start with fresh people. Accordingly, there is sufficient competent and credible evidence to support the trial court's conclusion that Peterangelo and Schilling were not terminated for just cause but, rather, were wrongfully discharged by Eagle.

## C

Eagle's third contention is that the front pay and compensatory damage awards for Peterangelo and Schilling were against the manifest weight of the evidence and contrary to law because Section III, Paragraph G of the employment agreement requires employees to give written notice of any disputes regarding compensation to the President or Vice President of Eagle within thirty days of payment, and Peterangelo and Schilling failed to comply with this contractual requirement.

When interpreting contracts, common words will be given their ordinary meaning unless it would lead to an absurd result, or unless the contract itself evidences some other meaning. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 245–246, 7 O.O.3d 403, 405–406, 374 N.E.2d 146, 149–150. Furthermore, where parties following negotiations "make mutual promises which thereafter are integrated into an unambiguous contract duly executed by them, courts will not give the contract a construction other than that which the plain meaning of the contract provides." *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 55, 544 N.E.2d 920, 924.

Section III, Paragraph G of the employment agreement states that "[a]ny dispute of compensation or other incentive issue must be received in writing by Eagle Mortgage Corporation within 30 days *of payment.* Unless such notice is timely given, *payment* shall be determined sole and final satisfaction of all claims for any and all remuneration due." (Emphasis added.) The plain meaning of this provision is that Peterangelo and Schilling were contractually obligated to give written notice of any disputes regarding their compensation within thirty days after they received payment from Eagle.

■ The trial court awarded Peterangelo and Schilling judgments for front pay and, in the case of Peterangelo, an unpaid commission and an unpaid annual bonus. It is undisputed that Peterangelo and Schilling never received payment from Eagle for the period following their discharge or for Peterangelo's unpaid commission and annual bonus. The trial court's judgment awarding front pay and compensatory damages is consistent with the plain meaning of this provision in that these awards were damages for unpaid compensation that was never tendered by Eagle or received by Peterangelo and Schilling. Accordingly, the trial court's damage awards were not inconsistent with the plain meaning of the employment agreements.

### D

Eagle's fourth contention is that the trial court's computation of front pay was against the manifest weight of the evidence. Eagle argues that Peterangelo and Schilling were compensated entirely on a commission basis and, therefore, the trial court's use of an average weekly wage to calculate damages was erroneous. Also, Eagle contends that Peterangelo and Schilling failed to close on any mortgage loan for at least six weeks prior to their discharge, and, as a result, any front pay award should have reflected this inactivity.

■ Front pay is an equitable remedy intended to compensate wrongfully discharged employees where reinstatement would be impractical or an inadequate remedy. *Worrell v. Multipress, Inc.* (1989), 45 Ohio St.3d 241, 246, 543 N.E.2d 1277, 1282. Ohio courts have awarded front pay damages in cases where the discharged employee received compensation in the form of sales commissions. See *McGinnis v. Steele's Sports Co.* (Feb. 3, 1994), Cuyahoga App. No. 64509, unreported, 1994 WL 30441.

■ The trial record is replete with references to the boom-and-bust nature of compensation for mortgage loan officers based upon the uncertainty associated with closing on "pipeline" mortgages, that is, potential mortgage loans being processed by the loan officer. As a result, the trial court was appropriately cautious in awarding front pay damages based upon the volume of Peterangelo's and Schilling's "pipeline" mortgages, which might or might not have closed had Peterangelo and Schilling not been discharged. Instead, the trial court used the weekly average of the most recent year's compensation to calculate the appropriate front pay award. The trial court heard testimony from both Peterangelo and Schilling regarding their average weekly income based upon their 1992 annual wages, the length of their unemployment, and compensation received during their unemployment. Using these figures, the trial court calculated the average weekly income for 1992 and multiplied it by the number of weeks of unemployment and subtracted any unemployment benefits collected during the same

period. In light of the equitable nature of front pay damages, the trial court's use of an "average weekly wage" as opposed to calculating potential commissions was not against the manifest weight of the evidence and was not contrary to law.

### E

Eagle's final contention is that Peterangelo was not entitled to be paid an annual bonus for 1992 based upon the express terms of his employment agreement. Eagle argues that Peterangelo exercised his option on March 1, 1992 to receive full commissions and an annual bonus pursuant to the terms of Addendum A of the employment agreement. While Eagle does not dispute the validity of the bonus provision in the employment agreement, it argues that the trial court erroneously applied Peterangelo's January and February 1992 loan closings toward the 1992 annual bonus rather than starting with the March 1992 loan closings in order to determine the annual volume upon which the bonus was to be calculated. Presumably, the net result of starting with March 1992 closings is that Peterangelo would not have reached the minimum level of loan closings for 1992 to warrant an annual bonus under the terms of the employment agreement.

The employment agreement's relevant provisions regarding Peterangelo's bonus are as follows:

"III. Compensation

" * * *

"F. The Loan Officer shall receive additional incentive compensation based upon Addendum A, Paragraph 5.

"ADDENDUM A

" * * *

"5. There will be additional compensation *paid annually within 45 days of the calendar year end for accumulated annualized production volume* pursuant to the following schedule, and pursuant to Section III, Paragraph F:

"*ANNUAL CLOSING VOLUME*

"0–9.5 MM—0 Basis Points

"9.5–12 MM—05 Basis Points

"12–Up MM—10 Basis Points." (Emphasis added.)

As a general rule of contract construction:

"[I]f there is doubt or ambiguity in the language of a contract, the document is to be construed strictly against the party who prepared it or selected its language, and in favor of the party who took no part in its preparation or in the

selection of its language." *Brads v. First Baptist Church* (1993), 89 Ohio App.3d 328, 341, 624 N.E.2d 737, 746–747.

The ambiguity in Peterangelo's bonus provision is whether the term "accumulated annualized production" refers to calendar year production or annual production starting from the anniversary of the adoption of the bonus provision. The fact that the bonus itself was to be paid within forty-five days of the calendar year end strongly suggests that the corresponding annual production volume for the bonus was also to be based upon the calendar year. Moreover, the record is silent as to any prior understanding between Peterangelo and Eagle regarding the relevant annual period from which the bonus was to be computed. As a result, this ambiguity must be construed strictly against Eagle as the drafter of the employment agreement. Accordingly, we interpret the term "accumulated annualized production" as referring to the accumulated production for the calendar year, not for the year beginning with the anniversary of the adoption of the bonus provision.

With this interpretation, the trial court correctly calculated Peterangelo's annual bonus based upon his closing volume for calender year 1992. Accordingly, the trial court's calculation of Peterangelo's 1992 annual bonus is not against the manifest weight of the evidence and is not contrary to law.

Eagle's and Musgrave's first and second assignments of error are overruled.

## III

Sherer's, Peterangelo's, and Schilling's (cross-appellants') first cross-assignment of error is as follows:

"The trial court erred by failing to award compensatory damages in the form of 'front pay' for wrongful termination for the time period that began when Peterangelo started a new job and ending when he ultimately received compensation from the new employer."

Peterangelo argues that the trial court should have awarded him front pay for the period between his last paycheck from Eagle and his first paycheck from his subsequent employer, Home Ohio Mortgage, because even though he was hired by his new employer within four weeks after his discharge, he did not receive a paycheck from his new employer for over fifteen weeks after his discharge.

As an equitable remedy, front pay is left to the sound discretion of the trial court and the amount of damages is determined by the trier of fact. *Worrell,* 45 Ohio St.3d at 246, 543 N.E.2d at 1282. In *Worrell,* the court held that "as a result of breach of an employment contract where an employee has been wrongfully discharged, front pay, or lost future wages, may be awarded as

compensation *between the date of discharge and reemployment* in a position of equal or similar status." (Emphasis added.) *Id.* at 247, 543 N.E.2d at 1283. See, also, *Sutherland v. Nationwide Gen. Ins. Co.* (1994), 96 Ohio App.3d 793, 810–811, 645 N.E.2d 1338, 1350–1351.

█ The trial testimony shows that Peterangelo was unemployed for four weeks after his discharge from Eagle until he was employed by Home Ohio Mortgage. Based upon this testimony, the trial court calculated Peterangelo's front pay using four weeks of unemployment. Although Peterangelo did not receive his first paycheck from Home Ohio Mortgage until fifteen weeks after his discharge from Eagle, there is no testimony to suggest that Peterangelo's first paycheck from Home Ohio Mortgage did not compensate him for his work over the prior eleven-week period. Further, there is no testimony to suggest that Home Ohio Mortgage compensated Peterangelo at a lesser rate than Eagle. Accordingly, the trial court did not err in using Peterangelo's four weeks of unemployment in its calculation of front pay damages.

Sherer's, Peterangelo's, and Schilling's first cross-assignment of error is over-ruled.

### IV

Sherer's, Peterangelo's, and Schilling's second and third cross-assignments of error are as follows:

"The trial court erred by failing to construe ambiguous language contained in the section concerning employee indemnity and compensation disputes in the employment contracts between the parties against the drafter of the language, defendants-appellants.

"The trial court erred by improperly placing the burden of proof on the employees to prove that the employer had improperly converted their wages to its own personal use."

Sherer, Peterangelo, and Schilling argue that the express terms of their employment agreements did not authorize Eagle to deduct or "charge back" expenses from their paychecks and, therefore, such deductions were a "conversion" of their income. Further, Sherer, Peterangelo, and Schilling maintain that the trial court erred in placing upon them the burden of proof in showing that the "charge-backs" were improper and argue that the burden of proof should have fallen upon Eagle to establish a "lawful conversion."

█ In examining the employment agreements, this court is guided by the basic tenet that common words of a contract will be given their ordinary meaning unless it would lead to an absurd result, or unless the contract itself evidences

some other meaning. *Alexander,* 53 Ohio St.2d at 245–246, 7 O.O.3d at 405–406, 374 N.E.2d at 149–150. The employment contracts contained two separate sections that addressed the issue of "charge-backs." First, Section III, Paragraph E, in conjunction with Addendum A, Paragraph 4, states that compensation will be reduced based upon any amount of shortage under the heading of an "unapproved discount." Second, Section IX establishes that the loan officer agreed to indemnify Eagle from any and all loss arising from the officer's acts or omissions. Based upon these provisions, there is no ambiguity as to Eagle's contractual right to deduct losses in the form of unapproved discounts from the loan officer's paycheck.

 The term "unapproved discount," as defined by the employment agreements in Section II, Paragraph C, essentially means any deviation below the approved price of a mortgage loan that has not been approved by the president or vice president of operations of Eagle. The trial testimony establishes that Eagle's policy of deducting "charge-backs" from the loan officer's paycheck was an effort by Eagle to seek repayment for the fees and expenses that were not collected by the loan officer from the customer and, consequently, would otherwise have resulted in a loss for the company. Such "charge-backs" could reasonably be viewed as "unapproved discounts" in that, as a result of the uncollected fees and expenses, the price of the mortgage loan to the customer would deviate below the company's established price without the approval of Eagle.

Sherer, Peterangelo, and Schilling contend that some, if not all, of the "charge-backs" constituted an improper conversion of their personal funds. As we have just discussed, the "charge-back" policy was consistent with Eagle's contractual rights as set forth in the employment agreements, and the individual deductions from the loan officers' paychecks do not warrant further review under the doctrine of conversion.[3] We must, however, consider Sherer's, Peterangelo's, and Schilling's third assignment of error regarding the burden of proof.

 In its decision, the trial court held that "the Plaintiffs have not proven by a preponderance of the evidence that the complained of deductions from their paychecks were improper or constituted a breach of their employment contract."

The law regarding disputed deductions from a contractual employee's paycheck is not clearly stated, and we have not found a case on point establishing the burden of proof for such a matter. Nevertheless, the law does suggest that the

---

**3.** An action for conversion must satisfy the elements set forth in *Ohio Tel. Equip. & Sales, Inc. v. Hadler Realty Co.* (1985), 24 Ohio App.3d 91, 93–94, 24 OBR 160, 162–164, 493 N.E.2d 289, 291–293; however, we need not consider the conversion doctrine in light of the express contractual provisions permitting deductions for uncollected fees and expenses.

burden of proof of payment for services rendered does rest upon the person for whom the services were performed. See *In re Estate of Buckingham* (1967), 9 Ohio App.2d 305, 309, 38 O.O.2d 351, 353, 224 N.E.2d 383, 386 ("Payment is an affirmative defense which must be asserted and proved."); *Sullivan v. Sullivan* (1940), 66 Ohio App. 315, 317–318, 20 O.O. 139, 140–141, 31 N.E.2d 165, 166–167 (holding that when the defendant admits the allegations of a preexisting debt and pleads payment, the burden of proving such payment rests upon him); *Alperin v. Feldman* (App.1933), 14 Ohio Law Abs. 723, 726 ("[I]f an affirmative contract to pay money or to perform some duty is proved, it is then incumbent on defendant to prove payment, performance or tender, or a sufficient excuse therefrom."). Under the terms of an employment contract, if an employee performs services for an employer, he is entitled to compensation for such services, and, conversely, the employer is obligated to the employee for that compensation.

When an employer deducts sums from the amount that he is obligated to pay his employee, the result is that the employer has not satisfied his full obligation unless the deductions are justifiable. The deductions are in the nature of offsets to the wages of the employee, and the employer who claims to be entitled to the offset should bear the burden of proving that he is entitled to it. Therefore, we hold that where an employer deducts expenses from an employee's paycheck after services have been performed by the employee for the employer pursuant to an employment agreement, the burden of proof rests upon the employer to show that the deductions are valid and proper pursuant to the employment agreement or otherwise according to law.

There is no dispute that Sherer, Peterangelo, and Schilling provided services pursuant to their employment agreements for which they were entitled to compensation. As a result, Eagle incurred an obligation to pay Sherer, Peterangelo, and Schilling full compensation for their services under the terms of the employment agreements. In response to this obligation, Eagle claims that it had fully compensated Sherer, Peterangelo, and Schilling by paying them their contractual rate of compensation, less deductions for "charge-backs." Thus, in order to prove full payment for Sherer's, Peterangelo's, and Schilling's services, Eagle must prove that the deductions for "charge-backs" were valid and proper deductions pursuant to the employment agreements.

The trial record is not clear as to whether the disputed deductions were valid under the terms of the employment contracts in that some of the deductions may have been for fees or expenses already collected by Eagle from other sources. Furthermore, the trial record is unclear as to whether Sherer, Peterangelo, or Schilling, after receiving payments with disputed deductions, ever availed themselves of the contractual remedy provided for in their employment agreements. For example, Sherer testified that he may have submitted a letter to Musgrave

disputing deductions from his paycheck. Also, Schilling testified that he sent Musgrave numerous memos regarding disputed payroll deductions. Accordingly, we remand this cause to the trial court to determine:

1. What deductions were made by Eagle from Sherer's, Peterangelo's, and Shilling's paychecks;

2. Whether Sherer, Peterangelo, or Schilling disputed the invalid or improper deductions within thirty days by written notice to the president or vice president of Eagle as required by the employment agreements; and

3. Whether such deductions were valid under the terms of the employment agreements or otherwise according to law.

As we have discussed, the burden of proof rests upon Eagle to prove that the deductions from its employees' paychecks were proper and valid.

Sherer's, Peterangelo's, and Schilling's second cross-assignment of error is overruled.

Sherer's, Peterangelo's, and Schilling's third cross-assignment of error is sustained.

## V

Sherer's, Peterangelo's, and Schilling's fourth cross-assignment of error is as follows:

"The trial court erred by failing to make a finding of fact on the issue of whether defendants-appellants' actions which harmed [Sherer's] professional reputation, reduced his ability to fully serve his clients thereby decreasing his earnings, and made improper deductions from his paycheck constituted a breach of plaintiff-appellee Sherer's employment contract."

Sherer argues that (1) Eagle's payroll "charge-backs," (2) Eagle's failure to maintain its FHA mortgage business, and (3) Eagle's failure to pay Sherer a portion of his management salary created an unreasonable working environment, which forced Sherer to resign from Eagle. Accordingly, Sherer maintains that the trial court erred in not finding that he was constructively discharged from Eagle in violation of his employment agreement.

"A constructive discharge exists if an employee's working conditions are so difficult or unpleasant that a reasonable person would feel compelled to resign." *Scandinavian Health Spa, Inc. v. Ohio Civ. Rights Comm.* (1990), 64 Ohio App.3d 480, 487, 581 N.E.2d 1169, 1173; *Sutherland,* 96 Ohio App.3d at 806, 645 N.E.2d at 1347–1348; *Neal v. Hamilton Cty.* (1993), 87 Ohio App.3d 670, 676, 622 N.E.2d 1130, 1134–1135; *United Parcel Serv., Inc. v. Ohio Civ. Rights Comm.* (1991), 71 Ohio App.3d 146, 148, 593 N.E.2d 87, 88–89. "Such a

determination requires a case-by-case analysis and an 'inquiry into the intent of the employer and the reasonably foreseeable impact of the employer's conduct on the employee.' " *Scandinavian Health Spa, Inc.,* 64 Ohio App.3d at 487, 581 N.E.2d at 1173; *Sutherland,* 96 Ohio App.3d at 806, 645 N.E.2d at 1347–1348; *Neal,* 87 Ohio App.3d at 676, 622 N.E.2d at 1134–1135.

█ Sherer maintains that Eagle's "charge-back" deductions were improper, were made without his express permission, and created an unreasonable working environment that forced his resignation. As we discussed above, Eagle's policy of "charge-back" deductions was made pursuant to the terms Sherer's employment agreement and did not constitute a conversion of his wages. Further, there is no testimony to suggest that Eagle targeted Sherer for "charge-backs" or deducted such expenses from Sherer's pay with the intent of forcing his resignation. In sum, the trial testimony shows that the "charge-back" deductions did not create a working environment that was so difficult or unpleasant that a reasonable person would have resigned.

Sherer also maintains that Eagle's loss of FHA mortgage business forced him to resign because it hurt his reputation in the real estate community by preventing him from servicing his existing and potential FHA mortgage customers. Significantly, Sherer testified at trial that it was Eagle's prerogative whether it wanted to service FHA mortgages as a part of its business. Accordingly, Sherer's disagreement with Eagle's legitimate business judgment does not constitute such a difficult or unpleasant working environment that a reasonable person would have felt forced to resign.

Finally, Sherer argues that Eagle's failure to pay him $250 for his last two weeks as an office manager forced him to resign. Sherer testified that Eagle appointed him as office manager starting November 1, 1992 at a rate of $500 per month. He was paid $250 on November 15 as office manager and later resigned from Eagle on December 3, 1992. Based upon these dates, Eagle would have only been, at the most, several days late in paying Sherer when he resigned. Further, the trial record is devoid of any testimony in which Sherer requested or otherwise complained to Eagle about payment of the final $250 office manager's salary *before* he resigned on December 3, 1992. Moreover, when asked at trial to give the reasons why he resigned from Eagle, Sherer did not testify that Eagle's failure to pay his final $250 office manager's salary was a reason for his resignation. Based upon the foregoing, the trial court did not err in concluding that Sherer was not constructively discharged from Eagle when he resigned on December 3, 1992.

Sherer's, Peterangelo's, and Schilling's fourth assignment of error is overruled.

## VI

Sherer's, Peterangelo's, and Schilling's third cross-assignment of error having been sustained, and all other assignments of error, by all parties, having been overruled, the judgment of the trial court is reversed, and this cause is remanded for further proceedings consistent with this opinion, including, specifically, a determination:

1. What deductions were made by Eagle from Sherer's, Peterangelo's, and Schilling's paychecks;

2. Whether Sherer, Peterangelo, or Schilling disputed the invalid or improper deductions within thirty days by written notice to the president or vice president of Eagle as required by the employment agreements; and

3. Whether these deductions were valid under the terms of the employment agreements or otherwise according to law, with the burden of proof resting upon Eagle to show that the deductions were valid and proper.

*Judgment reversed*
*and cause remanded.*

GRADY and FREDERICK N. YOUNG, JJ., concur.