**Charles K. RILEY, Plaintiff,**

v.

**INTEREP ASSOCIATES, INC., Defendant.**

**Civ. A. No. C80-2155A.**

United States District Court, N. D. Georgia, Atlanta Division.

March 16, 1982.

H. Patterson Garner, Buford, Ga., for plaintiff.

Charles, J. Cooper, Long, Aldridge, Heiner, Stevens & Sumner, Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, District Judge.

The plaintiff has brought this suit for breach of contract and the defendant counterclaimed for defamation and tortious in-

---

**2.** The author is now an Associate Justice of the Supreme Judicial Court of Massachusetts.

terference with the defendant's business. The suit was originally brought in the Superior Court of Gwinnett County, Georgia, and was removed by the defendant pursuant to 28 U.S.C. § 1441.

Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332 (1970).

The defendant has moved for summary judgment on all of the plaintiff's claims. For the reasons set forth below, the defendant's motion is GRANTED.

This suit arises from a familiar, but nonetheless compelling and unfortunate occurrence, a rift between the owners of a small, closely held corporation. The defendant, Interep Associates, Inc. ("Interep") is an independent sales company, known in the business as a "manufacturers' rep," which solicits orders for the manufacturers of electronic parts. The plaintiff, Charles Riley ("Riley") is a 20% shareholder and former employee of Interep.

Interep was founded in 1972 by James B. Smith ("Smith") and George Greene ("Greene") who, together with members of their immediate families, owned all of the stock of Interep. Riley joined Interep as a salesman in April, 1975. Approximately thirteen months later he was named vice-president and invited to join the board of directors. At the same time, Riley was given an opportunity to begin the purchase of Interep shares. Riley resigned his position as vice-president and salesman at Interep in April, 1980.

Riley's resignation letter asserted that Interep was required to buy back his stock upon his resignation and requested a purchase offer. Interep offered approximately $30,000, Riley's purchase price. Riley declined the offer. He maintains that upon his resignation Interep was obligated to repurchase his stock according to a formula which would yield the price of $153,000 for all of his 400 shares. This suit followed a breakdown of negotiations between Riley and Interep.

■ It is axiomatic that agreements for the purchase and sale of securities fall within the statute of frauds and must be in writing. The parties agree that the statute of fraud provisions applicable to this case are found in section 8–319 of the model version of the UCC which has been adopted in both Georgia and Alabama.[1] Riley contends that his stock repurchase agreement with Interep was reflected in two written documents. The first of these, a "Stock Purchase Contract," was executed June 1, 1976. This purchase contract provided that Smith and Greene would each sell Riley 200 shares, or 10 percent of Interep's stock, for $15,000 paid in unequal installments over a period of several years. Paragraph 5 of this agreement states:

> 5. RILEY, in execution of this agreement agrees to sign and abide by an Employment Agreement, which includes a stock buy and sell agreement for Interep Associates, Inc. stock, with Interep Associates, Inc. identical to that agreement presently in effect with GREENE and SMITH, or such future Employment Agreements approved by Interep Associates, Inc. Board of Directors, or voluntarily resign. The buy and sell provisions of any existing or future Agreement shall not take precedence over any provisions of this agreement.

---

1. In pertinent part that section provides:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within 10 days after its receipt; or

(d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price. *Ga.Code Annotated* § 109A–8–319; *Ala.Code* § 7–8–319.

488

The Employment Agreement signed by Smith, referred to in paragraph 5,[2] contains a detailed section dealing with Stock Redemption and Transfer. Paragraph 9(b) states that "Upon the voluntary termination of employment with the Company by the Employee, the Employee must sell his stock to the Company and the Company must redeem the Employee's stock at the price [established by following provisions]." Riley, however, never signed an employment agreement, or any other agreement, with Interep that contained a stock redemption provision.

Riley asserts, without any discernible reason, that the language of paragraph 5 clearly incorporates the provisions of the Smith employment agreement and that he is entitled to their benefit.

██ The language of paragraph 5 though convoluted, admits of only one interpretation. It is written in the disjunctive and provides that by executing the Stock Purchase Agreement, Riley agreed: (1) to sign an employee agreement with Interep which would include a stock redemption agreement of the specified description; or (2) to voluntarily resign. The Stock Purchase Agreement apparently anticipated a prompt attempt to sign an employment agreement. Therefore, the resignation required as an alternative to signing an employment agreement would fall under paragraph 4(d) of the Stock Purchase Agreement, which required a cancellation of the purchase agreement in the event of a resignation prior to completion of the installment sale of Interep shares to Riley. Even assuming that the Stock Purchase Agreement was an obligation of Interep and not of Smith and Greene personally, there simply is no stock redemption agreement between Riley and Interep. Smith's agreement is not incorporated in the Stock Purchase Agreement.[3] It is merely referred to as a key for one of two possible stock redemption agreements which Riley was to execute.

Concededly, the Stock Purchase Agreement did not anticipate the eventuality which actually came to pass. Riley neither signed an employment agreement, nor resigned, until long after the provisions of paragraph 4(d) were rendered moot by the consummation of the stock sale. But under the circumstances this has no effect.

The Stock Purchase Agreement does not specify on its face where responsibility for preparing an employment agreement between Interep and Riley rested. Riley does not allege that Smith or Greene, either individually or in their corporate capacities, made any attempt to hinder Riley and Interep from entering into an employment agreement. Riley was himself on the board of directors, and shortly after title to his shares of stock was transferred to him in early 1979, he requested and received from Interep a copy of the existing employment agreement between Interep and Smith.

The court observes that even after today's ruling, Riley's failure to sign an employment agreement is not entirely to his disadvantage, and may have been calculated. The employment agreement which Riley maintains was incorporated by reference into the Stock Purchase Agreement restricts the employee's right to dispose of his stock, and includes a non-competition provision. When Riley resigned from Interep he immediately established a competing firm, Dixie Technical Marketing. Had he signed an employment agreement such an action might have been barred.

Courts are ill-equipped to deal with disputes of the kind involved here. Many facts that are logically relevant are not legally relevant in such cases. It is apparent to the court from the pleadings, depositions, and exhibits that for many years Smith, Greene and Riley conducted the affairs of Interep in a harmonious and successful fashion. As with most small corpo-

**2.** The agreement with Greene was not filed with the court.

**3.** The opinion of Interep's Alabama counsel to the contrary, expressed in a settlement letter prior to the initiation of litigation, is not relevant to this court's construction of an unambiguous contract.

rations, the stockholders' relationships, among themselves and with their corporation, were highly informal. For example, Riley's original employment agreement with Interep included an oral provision that he would have an opportunity to purchase stock if "things worked out." Perhaps most notably, the arrangements called for under the Stock Purchase Agreement and their implementation from June, 1976 to January, 1979, bespeak a relationship based on the understandings of business partners, not legal formalities. Smith and Greene never turned over the stock certificates to an escrow agent as required by the Stock Purchase Agreement. But Riley accommodated them in this regard, and even allowed them to transfer to their children the ownership of the stock certificates reserved for sale to Riley, in order that they could gain a tax advantage.

It also appears to the court that the cause of Riley's resignation from Interep was a complex of factors including his perception that for some time, both in the field and in the decision making process, his position in the company had been diminishing. In particular, it appears that Interep had invested $155,000 in a lakeside property without fully consulting with Riley. Finally, after Riley left Interep, Greene also left, and was bought out on terms different than those specified in his employment agreement.

Nonetheless, having come to the courts for resolution of their disputes, the parties are now bound to accept the imposition of the court's legal solution to their conflict. The movant in a summary judgment proceeding bears the burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. The evidence presented must be construed in favor of the party opposing the motion, and the opposing party must receive the benefit of all favorable inferences that can be drawn from the evidence. Even when all of the evidence is construed in favor of Riley, he has failed to show a written agreement for the redemption of his shares of Interep stock.

Because of the finding that there was no written agreement for the redemption of Riley's shares it is unnecessary to consider whether the alleged agreement was signed by Interep, or if a valid agreement existed, which of the alternative valuation schemes provided by the agreement was the appropriate one to use.

The defendant's motion for summary judgment is GRANTED.