DECISION.
This is an employment case where plaintiff-appellee Paul W. Hilliard asserted age-discrimination and retaliation claims against defendant-appellant Huntington National Bank. In this appeal, which only involves the retaliation claim, we must decide whether the trial court erred in overruling a motion for judgment notwithstanding the verdict (JNOV) filed by Huntington after a jury determined that Huntington had retaliated against Hilliard. We must also determine if Hilliard was properly awarded damages, reinstatement, and prejudgment interest. We affirm the court in all respects except for the front-pay award that it granted to Hilliard.
 I. Background
Hilliard was born in 1941. In 1989, he was hired as branch manager of a Huntington bank in Blue Ash. He worked at Huntington in various capacities, including as a branch manager, area manager (overseeing several branches), and special-projects manager, until March 1995, when he was laid off as part of a general reduction in force. According to him, he performed his job responsibilities successfully during his employment at Huntington.
In August 1995, Hilliard, who was then fifty-four, learned that Huntington was looking for a branch manager at the Blue Ash location, his old position. He applied for the job. But it was ultimately given to a man who was thirty-seven.
As a result of not getting the position, Hilliard filed an age-discrimination charge with the Equal Employment Opportunity Commission (EEOC) and an age-discrimination lawsuit in the Hamilton County Court of Common Pleas. In the lawsuit, he sought damages and reinstatement.
In June 1996, a branch-manager position opened at Huntington's Fourth Street location in downtown Cincinnati. Huntington posted this opening to its current employees and received three applications. Huntington hired one of these applicants, Carl McCrary, who was a branch manager at another location when he applied.
When Hilliard learned that the Fourth Street position had been open and that Huntington had posted and hired from within, he amended his lawsuit to add a retaliation claim under Ohio's civil-rights statutes., the subject of this appeal. He claimed that he would have applied for and received the position, but that Huntington had purposely failed to inform him of it. According to him, Huntington's actions were taken in retaliation for his filing of the EEOC charge and the discrimination lawsuit.
A jury heard the case. For his retaliation claim, Hilliard offered his own testimony. He also adduced testimony from Merwin Grayson, the president and chief executive officer for Huntington's southern region; Steve Daniels, the senior vice president of retail banking for the southern region; and Julie Heard, Huntington's human-resources manager.
Hilliard testified that, when the Fourth Street position had opened, he had been actively seeking a position in the banking industry. He asserted that Huntington had been aware that he was seeking such a position. Specifically, he pointed out that he had applied for the Blue Ash position in August 1995. Also, Heard testified that she was aware that Hilliard had sought reinstatement when he filed his original lawsuit against Huntington.
Hilliard also presented evidence that Daniels, the person responsible for filling the Fourth Street position, wanted to hire him. Hilliard showed that there were three separate discussions regarding his hiring: (1) one between Daniels and Grayson, (2) one between Daniels and Heard, and (3) another in a meeting with Daniels, Grayson, and Heard all present. Grayson testified that Daniels approached him and mentioned the possibility of considering Hilliard for the Fourth Street position. Heard testified that Daniels approached her about considering Hilliard. She stated that Daniels said, "I wish we had Paul," and that he stated that Hilliard would have "worked" in the position.
In addition, Hilliard presented evidence that Huntington's failure to follow through on Daniels's interest in him was related to his pending age-discrimination litigation. Daniels testified that Grayson was concerned with the litigation:
 Q. Do you recall Mr. Grayson saying to you in that initial discussion that he had concerns about the fact that Mr. Hilliard and the bank were in litigation?
 A. I know that the concern * * * there was litigation; yes, that was our concern. Mr. Grayson directed me then to discuss that with legal counsel.
Heard stated that she was "uncomfortable" with considering Hilliard because of the pending action.
Finally, Hilliard presented evidence that Huntington decided to "exhaust internal applicants" before looking outside the company, a process that resulted in the hiring of McCrary. Because McCrary, an internal applicant, was hired for the position, Hilliard was never contacted.
Hilliard testified that Huntington's decision to exhaust internal applicants was not normal procedure. He pointed out past instances where external candidates had been considered at the same time with internal candidates for management positions. He also highlighted a written policy of Huntington that provided, "Internal and external applicants may be considered simultaneously for exempt/officer positions in order to select the applicant whose qualifications best satisfy the Huntington's needs for the position." He testified that he would have applied for and accepted the position if he had known about it and if it had been offered to him.
In response, Huntington adduced evidence that Hilliard was not actively seeking banking positions when the job at Fourth Street opened. It pointed out that Hilliard did not apply for any positions at Huntington between August 1995 and June 1996, and that Hilliard did not even inquire about openings. It also asserted that Daniels had never seriously considered Hilliard for the Fourth Street position. Daniels testified that his consideration of Hilliard never rose to a serious level and that all his discussions about hiring Hilliard totaled less than forty-five seconds. He explained that he had only considered Hilliard for the job because he thought that it might have been a good way to end Hilliard's lawsuit, thus avoiding any more costly legal expenses — an idea that was ultimately rejected by the company. Also, Huntington presented evidence that it had a general policy of promoting within the company whenever possible and that its decision to exhaust internal applicants was in compliance with its normal hiring procedures. Heard, for instance, testified that "ninety percent or more" of branch-manager positions had been filled by first looking within the company. Thus, Huntington argued that its decision not to contact Hilliard was simply a business decision that had nothing to do with retaliation against Hilliard.
The jury ultimately rejected Hilliard's discrimination claims, but unanimously found in his favor on the retaliation claim (as indicated by a jury interrogatory). The jury awarded $248,704 to Hilliard. That award consisted of compensatory damages of $65,000, back pay of $33,704, and front pay of $150,000.
Huntington filed a motion for JNOV or for a new trial. The court denied that motion, but it granted motions filed by Hilliard for reinstatement and prejudgment interest.
Huntington now contests the jury's verdict and the decisions made by the court after the trial. It asserts four assignments of error.
 II. Motion for JNOV
In its first assignment, Huntington asserts that the court erred in denying its motion for JNOV. In reviewing a motion for JNOV, "[t]he trial and appellate courts, without weighing the evidence, must construe the evidence most strongly in favor of the non-moving party, and determine whether reasonable minds could only conclude in favor of the movant. If the evidence admits of only one conclusion[,] a motion for JNOV is appropriately granted."[1] Applying that standard, Huntington argues that the evidence presented by Hilliard was much too speculative for a jury to conclude reasonably that there was retaliation. We disagree — while the evidence was less than overwhelming, and the jury could have easily reached the opposite conclusion, there was enough evidence to sustain the jury verdict.
Hilliard's retaliation claim was brought under Ohio's civil-rights statutes, R.C. Chapter 4112. Those statutes prohibit retaliation against persons who have opposed any unlawful discriminatory practices defined under the civil-rights statutes or against persons who have filed charges of discrimination.[2] To establish retaliation, a plaintiff must show (1) that he or she engaged in protected activity, (2) that he or she suffered an adverse employment action, and (3) that the adverse action followed the protected activity and was causally related to it.[3] Although retaliation generally involves actions taken against current employees, it can also extend to adverse actions taken against former employees.[4]
Here, we conclude that Hilliard presented enough evidence for the jury reasonably to find that Huntington had retaliated against him for filing his EEOC charge and discrimination lawsuit. To begin, he presented evidence that Huntington was aware that he was seeking a bank-management position. He also showed that Daniels wanted him for the Fourth Street position, with Daniels expressing that interest in separate meetings with Grayson and Heard, as well as another meeting with both Grayson and Heard. Also, Hilliard showed that Huntington based its decision not to contact him on the fact that he had filed a lawsuit against the company. In addition, he presented evidence that Huntington's decision to look first within the company — a decision that resulted in the hiring of McCrary — was not necessarily normal procedure. Finally, he testified that he would have applied for and accepted the position if he had known about it and if it had been offered to him.
Based on the evidence, the jury unanimously concluded that Huntington had retaliated against Hilliard. Although Huntington presented what we believe to be reasonable evidence to rebut inferences of retaliation, we cannot conclude that the court erred in overruling Huntington's motion for JNOV — Huntington's evidence was not so overwhelming that it "admit[ted] of only one conclusion." Viewing the evidence in the light most favorable to Hilliard, as we are required to do, we conclude that the evidence was sufficient for the jury reasonably to determine that Huntington took the adverse action of not considering and hiring Hilliard for the Fourth Street position because Hilliard had filed an EEOC charge and a lawsuit against the company.[5] Thus, Huntington's first assignment is overruled.
 III. Compensatory Damages, Reinstatement, and Front Pay
In its second and third assignments, which we treat together, Huntington challenges the compensatory damages, reinstatement, and front pay awarded to Hilliard. Regarding the $65,000 in compensatory damages, the jury awarded this to encompass the mental anguish that Hilliard testified he suffered as a result of Huntington's failure to hire him. Specifically, Hilliard explained that he felt worse than he had ever felt in his life, like he was "falling apart." He described the embarrassment he felt in front of long-time friends and associates, who he believed perceived him as being a failure. He also told about the fear that he had for his future and how he was having trouble sleeping, waking up four or five times a night. This pain and suffering, according to him, was the result of his exclusion from the banking industry, an area where he had once flourished. He also claimed that it was the result of being forced to work in unfamiliar areas, such as real estate, furniture sales, and fast food, which paid less money than Huntington did and which did not provide retirement benefits.
Huntington argues that the compensatory-damage award was too speculative. It claims that Hilliard was unclear as to whether his mental anguish was the result of his initial job loss at Huntington, his failure to be hired at the Blue Ash location, or his failure to be hired for the Fourth Street position. But the general rule is that courts are not encouraged to substitute their judgment for that of juries.[6] A court should not disturb a jury's award without "an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive."[7] Here, after reviewing the record, we cannot conclude that the jury's compensatory-damage award should be disturbed. We hold that the jury could have reasonably determined that Hilliard's pain and suffering was linked to Huntington's retaliation against him. We also conclude that the $65,000 award was not manifestly excessive, especially in light of the fact that other discrimination and retaliation cases have included substantially higher amounts for emotional damages.[8]
As for reinstatement, the trial court ordered Huntington to place Hilliard immediately in the Fourth Street branch-manager position, or to place him in a comparable position. The purpose of reinstatement is to "make whole" a plaintiff by returning him or her to a position that he or she would have occupied had the illegal act not occurred.[9] (Because Hilliard never worked in the Fourth Street position, the more appropriate term here might be "instatement.") A plaintiff is presumptively entitled to reinstatement, unless the employer shows that it is inappropriate.[10] Such might be the case where hostilities between the parties would make it impractical, where the plaintiff has found or could have found other employment, or where it would displace an innocent employee.[11]
Here, Huntington argues that reinstatement is improper because Hilliard never showed any interest in a position at Huntington and because there was no evidence that he would have gotten the Fourth Street job in the first place. But Hilliard did show interest in Huntington: he applied for the Blue Ash position, and he requested reinstatement in his lawsuit. As for whether Hilliard would have gotten the job in the first place, we have already upheld the jury's verdict. That verdict implies that Hilliard would have gotten the position if Huntington had not retaliated against him. In fact, the jury unanimously answered "yes" to an interrogatory that asked if Hilliard had proved that his filing of the EEOC charge or his lawsuit "was a determining factor in [Huntington's] decision not to hire him as a manager of its Fourth Street Branch." Again we stress that, while Hilliard's evidence was less than overwhelming, it was enough evidence to sustain the jury verdict. Thus, we reject Huntington's arguments.
Also, we have not found sufficient evidence in the record to convince us that hostilities between the parties or Hilliard's employment after leaving Huntington should prevent reinstatement. And, in view of the provision in the court's order allowing Huntington the option of placing Hilliard in a position comparable to that on Fourth Street, displacement of McCrary, an innocent employee, is not an issue. Therefore, we uphold the court's reinstatement order.
Finally, Huntington argues that Hilliard's $150,000 front-pay award was excessive. Huntington makes arguments similar to those given in regard to reinstatement. But we do not need to address these arguments because we hold that Hilliard is not entitled to both front pay and reinstatement. Front pay is "an equitable remedy designed to financially compensate employees where `reinstatement' of the employee would be impractical or inadequate."[12] In other words, "reinstatement and front pay are alternative, rather than cumulative."[13] To award both would put a plaintiff in a better position than he or she would have been in had there never been an illegal act in the first place — the plaintiff would receive a front-pay award even though he or she would also be getting paid for working. Because we have upheld the court's order of immediate reinstatement, the "preferred remedy,"[14] we hold that Hilliard should not also be entitled to front pay.
We note, however, that the record is unclear as to how soon after the court's reinstatement order Hilliard was actually reinstated, or if Hilliard has been reinstated at all at this point. We conclude that Hilliard should be entitled to reasonable compensation for any time lost working before he actually was, or will be, reinstated. In other words, Hilliard is entitled to compensation for any gap between the time encompassing his original back-pay award and the time of his actual reinstatement. Therefore, we reverse the court's front-pay award. But we remand the case for the trial court to adjust Hilliard's back-pay award so that Hilliard is compensated for the time before he actually was or is reinstated. If Hilliard has not yet been reinstated, the court shall retain jurisdiction until Huntington actually reinstates him, and the court shall adjust the back-pay award at that time.
 III. Prejudgment Interest
In its fourth assignment, Huntington asserts that the court erred when it granted prejudgment interest to Hilliard. Specifically, the court awarded prejudgment interest on Hilliard's damages at the rate of 10% per annum from July 1, 1996, the date that the Fourth Street position was filled by McCrary. R.C.1343.03(C) governs when prejudgment interest should be awarded in civil actions based on tortious conduct, such as retaliation. The statute provides that prejudgment interest shall be awarded to a prevailing party if the losing party has "failed to make a good faith effort to settle the case." The burden of proof is on the party seeking prejudgment interest. That party should present evidence of an offer to settle that was reasonable considering such factors as "the type of case, the injuries involved, applicable law, defenses available, and the nature, scope and frequency of efforts to settle."[15] Other factors include "responses — or lack thereof — and a demand substantiated by facts and figures."[16] We review a court's determination regarding prejudgment interest under an abuse-of-discretion standard.[17] An abuse of discretion implies that "there is no sound reasoning process that would support that decision."[18]
Here, Huntington, which concedes that it never made a settlement offer to Hilliard, argues that it acted in good faith because it objectively believed that it had no liability to him. But the court found otherwise. The court explained that Huntington was periodically presented with and ignored notice that it might be liable, such as when the court partially denied a motion for summary judgment filed by Huntington. The court stated, "While a defendant's initial `zero' risk evaluation might reflect a rational evaluation of risk and potential liability at some earlier juncture, certainly it cannot justify a refusal to continue to evaluate the risk. This risk increases as litigation milestones, dispositive motions such as motions to dismiss and for summary judgment, do not resolve in favor of a party." Also, the court found that Hilliard made numerous good-faith attempts to settle the case and that Hilliard "removed a major obstacle to settlement by abandoning [an earlier] insistence on reinstatement, to which [Huntington] did not respond."
We hold that the record supports the court's findings and that the court's thorough decision to award prejudgment interest was not an abuse of discretion. Based on the efforts that Hilliard made to settle the case and on Huntington's lack of responses, it was reasonable for the court to conclude that Huntington had not made a good-faith effort to settle Huntington's fourth assignment is overruled.
Therefore, we affirm the court's denial of Huntington's motion for JNOV, the court's reinstatement order, the compensatory-damage award, and the court's decision to grant prejudgment interest. But we reverse the front-pay award. We remand this case for the court to adjust the back-pay award in accordance with this decision and to adjust the amount of prejudgment interest accordingly.
 Judgment affirmed in part and and reversed in part, and cause remanded.
Sundermann and Winkler, JJ., concur.
Please Note:
The court has placed of recorded its own entry in this case on the date of the release of this Decision.
[1] Shepherd v. Westlake (1991), 76 Ohio App.3d 3, 10,600 N.E.2d 1095, 1099.
[2] R.C. 4112.02(I).
[3] Pulver v. Rookwood Highland Tower Invests. (Mar. 26, 1997), Hamilton App. Nos. C-950361 and C-950429, unreported; see, also, Canitia v. Yellow Freight Sys., Inc. (C.A.6, 1990),903 F.2d 1064, 1066 (regarding equivalent federal standard).
[4] See, e.g., Veprinsky v. Fluor Daniel, Inc. (C.A.7, 1996),87 F.3d 881, 882(holding that "post-termination acts of retaliation that adversely affect the plaintiff's employment opportunities or are otherwise related to employment are cognizable under Title VII"); see, also, Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm. (1981),66 Ohio St.2d 192, 196, 421 N.E.2d 128, 131 ("federal case law interpreting Title VII * * * is generally applicable to cases involving alleged violations of R.C. Chapter 4112").
[5] See Ruggles v. California Polytechnic State Univ. (C.A.9, 1986), 797 F.2d 782, 786 (holding that an adverse employment decision can be the closing of a job opening and the loss of an opportunity even to compete for a position).
[6] Uebelacker v. Cincom Sys., Inc. (1992), 80 Ohio App.3d 97,103, 608 N.E.2d 858, 862.
[7] Moskovitz v. Mt. Sinai Med. Ctr. (1994), 69 Ohio St.3d 638,655, 635 N.E.2d 331, 345.
[8] See, e.g., Toole v. Cook (May 6, 1999), Franklin App. No. 98AP-486, unreported ($105,000); Moody v. Pepsi-Cola Metro. Bottling Co., Inc. (C.A.6, 1990), 915 F.2d 201, 203 ($150,000).
[9] Potocnik v. Sifco Indus., Inc. (1995), 103 Ohio App.3d 560,572-573, 660 N.E.2d 510, 518.
[10] Id.
[11] Hudson v. Reno (C.A.6, 1997), 130 F.3d 1193, 1202, certiorari denied, __ U.S. __, 119 S.Ct. 64; Reece v. Miami Cty. Mun. Court (Sept. 27, 1996), Miami App. No. 96 CA 3, unreported.
[12] Worrell v. Multipress, Inc. (1989), 45 Ohio St.3d 241,246, 543 N.E.2d 1277, 1282.
[13] Suggs v. Servicemaster Edn. Food Management (C.A.6, 1996),72 F.3d 1228, 1234.
[14] Reece, supra.
[15] Moscovitz, supra, at 659, 635 N.E.2d at 348.
[16] Id.
[17] Id. at 658, 635 N.E.2d at 347. 
[18] AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp. (1990), 50 Ohio St.3d 157, 161,553 N.E.2d 597, 601; State v. Echols (June 26, 1998), Hamilton App. No. C-970272, unreported; see, also, State v. Chapple (1983),135 Ariz. 281, 297, 660 P.2d 1208, 1224, fn. 18.