OPINION
Defendants-appellants, Tansky Sales, Inc., f/k/a Tansky Sawmill Toyota, Inc. ("the dealership" or "TST") and the estate of John Tansky ("John Tansky"), appeal from the judgment of the Franklin County Court of Common Pleas overruling their motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. After a jury trial, plaintiff-appellee, B. Richard Aldahan ("Aldahan") was awarded a total of $3,954,341 in damages for breach of contract and wrongful termination. For the reasons that follow, we affirm in part and reverse in part.
Aldahan began selling automobiles in 1983. His life's goal was to become an owner of automobile dealerships. (Tr. Vol. IV, at 41.) In June 1993, he was referred to defendant, Tom Tansky, in Columbus, Ohio, who was looking for a general manager and was willing to give up equity in his dealership for the right candidate. (Tr. Vol. I, at 87, 92-93.) After meeting with Tom Tansky, Aldahan agreed to become the general manager for the dealership. If successful in managing the dealership, he would be given an opportunity to become an owner of TST. (Tr. Vol. I, at 94.)
Aldahan was hired, effective June 14, 1993, as general manager. Aldahan executed an employment application, dated June 14, 1993, that stated, in pertinent part:
 * * * I understand that my employment and compensation can be terminated without cause or notice at any time at the option of myself or Toyota. I understand that no official of Toyota other than the President or a Senior Vice President has any authority to authorize an agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing. [Defendant's Exhibit 9.]
Aldahan started work for a draw of $6,500 per month against twenty-five percent of the net profits of the dealership. Later that year, Aldahan learned that Tom Tansky owned only forty-nine percent of the dealership while his father, John Tansky, owned fifty-one percent.
Under Aldahan's management, the dealership's sales and profits increased dramatically. The dealership went from losses of $169,000 in 1992, to profits of $600,000 in 1993, $1.4 million in 1994, $1.9 million in 1995, and $2.4 million in 1996. (Tr. Vol. 1A, at 6, 85; Plaintiff's Exhibit 10, at 4.) The dealership also earned prestigious awards for customer satisfaction and top performance that it had never earned before. (Tr. Vol. 1A, at 31-33.)
As the dealership became more successful, Aldahan talked with Tom Tansky about fulfilling his promise to become an equity owner of the dealership. Tom Tansky indicated that he did not intend to transfer any of his capital stock to Aldahan, but, rather, expected Aldahan to work out a deal with John Tansky to buy some of his stock.
Over the next year, Aldahan and John Tansky engaged in extensive negotiations over price and terms for the sale of stock. In 1995, the regional Toyota office conditioned renewal of the dealer's franchise upon transfer of partial ownership to Aldahan. The agreement provided, in pertinent part:
 Dealer agrees to transfer a minimum of 10% ownership of the capital stock of Tansky's Sawmill Toyota, Inc., with an option to purchase a minimum of 33% ownership within a ten (10) year period to the Cincinnati Region and Toyota Motor Sales, U.S.A., Inc. approved General Manager, Richard Aldahan. This transfer is to take place within six (6) months of the effective date of this Agreement. [Defendant's Exhibit 16.]
John Tansky signed that Toyota Dealer Agreement on September 28, 1995. During this period, Aldahan also pursued other dealer ownership opportunities in an attempt to gain leverage with the Tanskys.
John Tansky eventually set a value on the dealership of $9.1 million. In May 1996, Aldahan began talking to bankers to secure financing for the stock purchase. In August 1996, Robert I. Knight, the accountant for the dealership, drafted a document entitled: "MEMO RE: JOHN P. TANSKY/SAWMILL TOYOTA/RICHARD ALDAHAM [sic] AGREEMENT." Handwritten changes were made to the document, and the agreement was signed by Aldahan, Tom Tansky, and John Tansky, and witnessed by Knight at a meeting on December 3, 1996. The agreement was intended to be the framework for a subsequent formal agreement to be drafted by the Tanskys' corporate attorney, but the parties do not dispute that a binding contract was formed on December 3, 1996. A lawyer-drafted agreement was never signed.
The December 3, 1996 agreement dealt with several subjects, including the sale of stock and Aldahan's employment and compensation as general manager. With respect to the sale of stock, the agreement provided, in pertinent part, that:
 I. John P. Tansky to grant Richard Aldahan an option to buy 10% of his capital stock of Sawmill Toyota at price of $910,000.
* * *
 III. Aldahan to exercise this option on January 2, 1997 for $910,000 cash. If Aldahan is unable to pay the entire amount in cash the balance will be payable within 12 months at 9% interest. [Defendant's Exhibit 1.]
Additionally, the agreement provided that Aldahan had the option to purchase an additional three percent of stock per year until he reached thirty-three and one-third percent:
 Aldahan to be granted options to purchase an additional 3% per year until he has reached a total of 33-1/3%. The price after the first year is to be determined by formula as above. If Aldahan is unable to acquire the full 3%, the unpurchased percentage may be carried forward to the next year. The price on all of these purchases is to be determined under the formula unless there is some major catastrophe at which time price would be redetermined. [Defendant's Exhibit 1, at IV.]
In drafting the agreement, Knight suggested a 100-for-1 stock split to make the sale of stock easier:
 The corporation presently has 94 shares of common stock outstanding at a par value of $100/share for a total capital of $9,400. Before any stock transaction takes place I suggest a 100 for 1 stock split changing outstanding stock to 9,400 shares at $1.00 par for a total value of $9,400.00. This split will make sales of stock easier to handle. [Defendant's Exhibit 1, at IX.]
Assuming the split took place, John Tansky would then own 4,800 shares, and Tom Tansky would own 4,600 shares.
 After stock split the ownership will be John P. Tansky 4,800 shares, Thomas Tansky 4,600 shares. * * * [Id.]
Finally, prior to the sale to Aldahan, John Tanksy was to sell some of his shares to Tom Tansky, giving Tom Tansky a majority interest in TST:
 * * * Prior to sale to Aldahan John P. Tansky will sell 101 shares of his stock to Thomas Tansky effectively giving Tom control. Selling price will be $968.08/share ($9,100,000 divided by 9,400 shares) for a total of $97,776.08. [Id.]
The agreement also restructured Aldahan's compensation package giving him twenty percent of the dealership's net monthly profits and 2.5 percent of the profits at the end of each year. Prior to the agreement, Aldahan was receiving fifteen percent of the net profits each month and ten percent of the net profits at the close of the year:
 Aldahan is presently under a total compensation package which pays him 15% of net profits on a monthly basis and an 10% additional amount as of the close of each calendar year. This arrangement is to remain as is through December 31, 1996. Affective [sic] January 1, 1997 Aldaham's [sic] total compensation will be 20% net monthly and 2-1/2% as of the end of the calendar year. [Defendant's Exhibit 1, at VII.]
The agreement provided that, if Aldahan decided to leave his employment or if the corporation decided to terminate Aldahan, they were each to give ninety-days notice:
Termination of employment due to death, disability or other reasons:
 A. Aldahan must sell his stock back to the corporation and corporation is obligated to buy.
 B. Price is the same as his original purchase price plus his portion of the increase in LIFO reserve from the date of original purchase to the date of sale.
 C. Payment will be made by the corporation within 90 days of termination of employment.
 D. If Aldahan decides to leave employment he shall give 90 days notice. If corporation decides to terminate Aldahan they shall give 90 days notice. [Defendant's Exhibit 1, at V.]
Upon termination of employment, Aldahan was to sign a noncompetition agreement:
 On termination of employment Aldahan is to sign a noncompetition agreement for an area within 40 miles radius of Sawmill. [Defendant's Exhibit 1, at VI.]
The agreement also provided that, effective January 1, 1997, Tom Tansky was to receive a monthly bonus equal to ten percent of the profit of the corporation:
 Effective January 1, 1997 Tom Tansky is to receive a monthly bonus equal to 10% of the profit of the corporation. This is in addition to his present salary. This bonus is computed by accruing an estimated amount of the bonus on the books at the end of each month in order to arrive at an estimated net monthly profit. The 10% is then computed on this estimated net income. Any adjustment from the estimate is made on the 15% [sic] of the following month. This procedure is the same as used in computing Aldaham's [sic] monthly bonus. [Defendant's Exhibit 1, at VIII.]
Aldahan testified that, prior to or at the meeting on December 3, 1996, John Tansky orally agreed to finance the entire purchase for twelve months at nine percent interest in exchange for postponing the transfer until after January 1, 1997. (Tr. Vol. 1A, at 93-94.) Thus, when Aldahan left the meeting on December 3, 1996, his understanding was that, on January 2, 1997, he would be a ten percent owner of the corporation and that he would either give John Tansky $910,000 or let John Tansky finance the purchase and owe John Tansky an additional nine percent of $910,000 or $81,000 by year's end. (Tr. Vol. 1A, at 106.)
After the December 3 meeting, Knight prepared stock certificates with an effective date of January 2, 1997, in anticipation of the sale. (Defendant's Exhibit 56; Tr. Vol. V, at 142-144.) He mailed them to Tom Tansky, but they were never signed. The stock certificates, as prepared, indicated the 100-for-1 stock split left John Tansky owning 3,860 shares, or forty-one percent of the outstanding shares, Tom Tansky owning 4,600 shares, or forty-nine percent of the outstanding shares, and Richard Aldahan owning 940 shares, or ten percent of the outstanding shares. The stock certificates did not reflect a transfer of 101 shares from John Tansky to Tom Tansky.
Immediately after the December 3, 1996 meeting, Aldahan requested that he receive his 1996 year-end bonus early so he would be ready to perform on January 2, 1997, assuming the Tanskys kept their end of the bargain. (Tr. Vol. II, at 19.) Aldahan also obtained a $500,000 loan from Key Bank and had the remaining $410,000 available in liquid investments. On January 2, 1997, Aldahan did not tender any part of the purchase price to John Tansky, nor did he ever tender any part of the purchase price to John Tansky. The suggested stock split did not take place. The stock transfer from John Tansky to Tom Tansky that was to take place prior to the sale did not go forward either. However, Aldahan did begin receiving twenty percent of the net profits monthly as provided for in the December 3, 1996 agreement, and Tom Tansky did receive at least some of his ten percent monthly bonus. (Tr. Vol. II, at 208-209.)
In early 1997, Aldahan received assurances from Tom Tansky that the stock sale would go through and that his employment was secure. In reliance upon those assurances, Aldahan believed his employment was secure for the next ten years. Aldahan then purchased an expensive home and withdrew from an opportunity to purchase an automobile dealership that he had been pursuing.
In late January, Knight came to Columbus to do the year-end review of the books. Knight talked to John Tansky who indicated that he had not yet received any money from Aldahan. Knight asked John Tansky if he was worried that he had not received any money, but John Tansky said that "I really don't care whether or not Aldahan wants to buy or not. If he doesn't want to buy, that's fine." (Tr. Vol. V, at 145.) Knight also had conversations with John Tansky in early March in which John Tansky indicated that Aldahan still had not paid any money. In April or May 1997, John Tansky indicated to Knight that Aldahan was unhappy with the terms of the contract and wanted to reopen negotiations. (Tr. Vol. V, at 146-147.)
In April of 1997, the Tanskys' lawyer drafted a formal stock purchase agreement. (Plaintiff's Exhibit 4.) Aldahan hired an attorney to review the contract drawn up by the Tanskys' lawyer and to draft his own version of the agreement. (Plaintiff's Exhibit 6.) The draft contracts drawn up by the attorneys contained areas of dispute. For example, on April 2, 1997, the Tanskys' attorney wrote a letter to John Tansky enclosing a draft stock purchase agreement and noting that the "disputed issues" were: (1) the buy-back price/formula and "floor" price for the stock; (2) the right to purchase the business; and (3) the issue of a proposed salary increase for John Tansky. (Plaintiff's Exhibit 6.) Relations between Aldahan and John Tanksy began to deteriorate and eventually became hostile. John Tanksy refused to accept any of Aldahan's proposed revisions to the stock purchase agreement and threw the draft contracts away. A lawyer-drafted agreement was never executed.
In the fall of 1997, Aldahan perceived that John Tansky was forcing him to resign by reducing his compensation. This was accomplished by means of reducing the dealership's net profits. The Tanskys began to put additional family members on the payroll and increased other family members' salaries. (Tr. Vol. II, at 61-62.) In a conversation with John Tansky, Aldahan told John Tansky that John Tansky was forcing Aldahan to resign. But in a subsequent conversation, John Tansky told Aldahan "okay, I'm tired of dealing with this. You win. You are younger than I am. Let's proceed." (Tr. Vol. II, at 72.)
Aldahan followed up this meeting by writing a letter to John Tansky on October 18, 1997, stating that he was ready to complete documentation of the ownership position that was effective January 2, 1997. John Tansky responded by letter on October 23, 1997, informing Aldahan that, since he had not exercised his option on January 2, 1997, and since they had been unable to settle on new terms, John Tansky was withdrawing his offer to sell any shares of TST. Aldahan responded by letter on October 28, 1997, that the option had been exercised, and he again requested action to document his purchase and ownership of the stock. On November 4, 1997, John Tansky sent a second letter to Aldahan terminating his employment. Aldahan was not given ninety-days notice of his termination.
Aldahan filed suit, asserting claims for fraud, wrongful termination, promissory estoppel, and breach of contract. The trial court granted appellants' motion for summary judgment with respect to the fraud claims. Claims for breach of contract, promissory estoppel as related to promises of future employment, and wrongful termination went to trial.
The jury returned a verdict in favor of Aldahan against John Tansky on the breach of contract claim for refusing to transfer stock in the amount of $818,620. The jury returned separate verdicts in favor of Aldahan and against TST on the other claims, awarding $786,517 for breach of contract, $2,349,204 for wrongful termination, and $0 for promissory estoppel. Appellants filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The trial court, in an April 28, 1999 decision and entry, and final judgment entry of May 14, 1999, overruled their motion.
On appeal, appellants raise the following three assignments of error:
 1. The Common Pleas Court erred in denying Appellants' Motion for Judgment Notwithstanding the Verdict or for a New Trial.
 (a) Aldahan's failure to pay all or any part of the $910,000 purchase price precludes any judgment against John Tansky for refusing to transfer his stock.
 (b) The $787,517 verdict against Tansky Sawmill Toyota for breach of contract must be vacated because Aldahan has claimed only $229,802 for that alleged breach.
 (c) The $2,349,204 verdict against Tansky Sawmill Toyota for wrongful termination and the $818,620 verdict against John Tansky for breach of contract must be vacated because they are based on lost profit claims that were contrary to actual fact, unsupported by expert testimony, speculative and not proved with reasonable certainty, nor did they take into account mitigation of damages.
 2. The Common Pleas Court erred as a matter of law in permitting the jury to consider parole [sic] evidence and in permitting the jury to interpret the clear and unambiguous terms of the parties' December 3, 1996 Agreement.
 3. The Common Pleas Court erred as a matter of law in instructing the jury to consider Aldahan's wrongful termination of employment claim as an independent cause of action.
In analyzing a motion for judgment notwithstanding the verdict, the evidence is construed most strongly in favor of the nonmovant, who is also given the benefit of all reasonable inferences from the evidence. Ruta v. Breckenridge-Remy Co.
(1982), 69 Ohio St.2d 66, 68. The reviewing court must neither weigh the evidence nor the credibility of the witnesses. Oslerv. Lorain (1986), 28 Ohio St.3d 345, syllabus. Nickell v.Gonzalez (1985), 17 Ohio St.3d 136, 137, quoting Posin v. A. B. C.Motor Court Hotel (1976), 45 Ohio St.2d 271, 275. A motion for judgment notwithstanding the verdict should be denied if there is substantial evidence upon which reasonable minds could come to different conclusions on the essential elements of the claim.Posin, supra, at 275. Conversely, the motion should be granted where the evidence is legally insufficient to support the verdict.County Savings Bank v. Sain (Apr. 21, 1992), Franklin App. No. 91AP-380, unreported.
In analyzing the trial court's denial of a motion for a new trial, a reviewing court must apply a different standard of review than that applied to the denial of a motion for judgment notwithstanding the verdict. Specifically, when a party files a motion for a new trial asserting that the judgment is not sustained by the weight of the evidence, the trial court must review the evidence presented at trial and pass upon the credibility of the witnesses and the evidence in general. Furthermore, in addressing a motion for new trial, the trial court necessarily involves itself with questions of fact, unlike the criteria for determining a motion for judgment notwithstanding the verdict. Rohde v. Farmer (1970), 23 Ohio St.2d 82, 92. The trial court is in the best position to decide issues of fact and is, therefore, vested with broad discretion in ruling upon new trial motions made pursuant to Civ.R. 59(A)(6). Monroe v. Ohio Dept. ofRehab. Corr. (1990), 66 Ohio App.3d 236, 240.
In their first assignment of error, appellants assert that the unambiguous terms of the December 3, 1996 agreement required Aldahan to pay John Tansky some portion of the $910,000 in cash on January 2, 1997, in order to obtain ten percent of the dealership's stock. It is undisputed that Aldahan never tendered any money for the purchase of the stock. Thus, according to appellants, interpretation of the December 3, 1996 agreement was a matter of law for the court, and it was error for the trial court to submit the question to the jury and to admit parol evidence that Aldahan and John Tansky orally agreed that John Tansky would finance the entire transaction. Appellants argue that the specific contract language contradicts any such oral agreement, as it provides that if Aldahan is unable to pay the entire amount in cash, the balance will be payable within twelve months at nine percent interest.
Aldahan took the position at trial that he was not required to pay John Tansky anything on January 2, 1997, because John Tansky had offered to finance the entire transaction and that Aldahan could simply pay John Tansky interest. Aldahan also argued that, under Section IX of the December 3, 1996 agreement, the 100-to-1 stock split, the transfer of 100 shares to John Tansky, and the written approval of the change in ownership by Toyota, were conditions precedent to Aldahan's duty to pay any portion of the purchase price. Thus, according to Aldahan, John Tansky had nothing to sell to Richard Aldahan on January 2, 1997, because John Tansky had not taken steps to complete the stock split, transfer control to Tom Tansky, and obtain written permission from Toyota for a change in ownership. (Defendant's Exhibit 16, at 3; Tr. Vol. 1A, at 103.)
The trial court instructed the jury that some parts of the contract were ambiguous and that the intent of the parties at the time the contract was signed was a question of fact for the jury to decide. (Tr. Vol. VIII, at 21.) The trial court then instructed:
 Another ambiguous provision in the contract is paragraph III which provides:
 "Aldahan to exercise this option on January 2d 1997 for $910,000 cash. If all [sic] Aldahan is unable to pay the entire amount in cash, the balance will be payable within twelve months at [sic] percent interest."
The question for you, the jury, to determine is whether as the Defendants contend, that Richard Aldahan was to pay the entire amount, $910,000 cash on January 2d 1997, and/or if not the entire amount, some amount to be paid on January 2d 1997, and the balance to be financed by Defendant John P. Tansky at 9 percent interest and/or whether the parties intended that John P. Tansky would finance the entire amount at 9 percent interest, and the Plaintiff would pay the $910,000 with interest at a later time. [Tr. Vol. VIII, at 22.]
Generally, if a contract is clear and unambiguous, its interpretation is a matter of law and no issue of fact exists to be determined. State ex rel. Parsons v. Fleming (1994), 68 Ohio St.3d 509, citing Davis v. Loopco Industries, Inc. (1993), 66 Ohio St.3d 64,66; Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241
. Only where a contract is unclear or ambiguous or when the circumstances surrounding the agreement invest the language of the contract with a special meaning, will extrinsic evidence be considered in an effort to give effect to the parties' intentions.Shifrin v. Forest City Ent., Inc. (1992), 64 Ohio St.3d 635, syllabus.
The test for determining whether a term is ambiguous is that common words in a written contract will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clearly evidenced from the face or overall content of the contract. Alexander v. Buckeye Pipe Line Co.
(1978), 53 Ohio St.2d 241, paragraph two of the syllabus. Parol evidence directed to the nature of the contractual relationship is admissible where the contract is ambiguous and the evidence is consistent with the written agreement which forms the basis of the action between the parties. Illinois Controls, Inc. v. Langham
(1994), 70 Ohio St.3d 512, paragraph two of the syllabus.
In the case before us, paragraph III of the contract is an unambiguous expression of the means by which Aldahan could exercise his option to purchase John Tansky's stock. The trial court, therefore, erred as a matter of law when it held that paragraph III of the contract was ambiguous. It was also error for the trial court to submit the question of the parties' intent to the jury and to admit parol evidence to vary the express language of the contract.
An option contract consists of two independent elements: (1) an offer to buy, sell, or perform some other act which does not become a contract until accepted; and (2) the binding agreement to leave the offer open for a specified period of time.Plikerd v. Mongeluzzo (1992), 73 Ohio App.3d 115, 122, citing 17 Ohio Jurisprudence 3d (1980) 453-455, Contracts, Section 22. The option contract prevents the party who signs it from disposing of the property under consideration until its expiration. The party having the option is not bound to exercise it, and he can withdraw from it at any time prior to his exercise of the option.
Moreover, in an option contract, a party may exercise its option only in the manner provided in the contract. LakeRidge Academy v. Carney (1993), 66 Ohio St.3d 376, 380, citingMidland Properties Co. v. Union Properties, Inc. (N.D.Ohio. 1957), 148 F. Supp. 150, 152. If the option designates the manner of acceptance and method of payment, the optionee must comply with the terms. Rossman Co. v. Donaldson (Dec. 6, 1994), Franklin App. No. 94APE03-388, unreported. If a time limit is given for exercising the option, the option may not be exercised after that time has passed. Lake Ridge Academy, supra, citing Longworth v.Mitchell (1875), 26 Ohio St. 334, 342; Brown Motor Sales, Inc. v.Keeley and Ohio Telephone Equip. Sales, Inc. (Sept. 30, 1996), Lucas App. No. L-95-330, unreported.
Here, Aldahan had the option on January 2, 1997 to accept John Tansky's offer to sell ten percent of the dealership stock for $910,000. Aldahan was not bound to purchase the stock on January 2, 1997, and would not have been in breach if he had failed to exercise the option. Likewise, John Tansky would not have been in default for failing to deliver the stock if Aldahan did not tender the purchase price. By the express terms of the agreement, Aldahan had to pay at least a portion of the $910,000 purchase price in cash on January 2, 1997 in order to accept the offer and exercise the option. His failure to do so on January 2, 1997, meant the option expired.
Aldahan's testimony that, at or prior to the December 3 meeting, John Tansky offered to finance the entire transaction is at variance with the unambiguous language that "[i]f all Aldahan is unable to pay the entire amount in cash the balance will be payable within 12 months at 9% interest." The use of the terms "entire" and "balance" means that Aldahan had to pay some amount. Moreover, Aldahan's testimony renders meaningless the language in that same paragraph that Aldahan was to exercise the option on January 2, 1997, for $910,000 cash. Such evidence was inadmissible both because the language of the contract was unambiguous and because the evidence was inconsistent with the agreement.
Aldahan's failure to exercise the option on January 2 did not preclude subsequent negotiations and, in fact, the parties did engage in further negotiations for the sale of the stock. But the parties were never able to agree on the terms of the sale, and ultimately the deal fell through.
Aldahan argues that his duty to tender part of the purchase price was never triggered or was excused because the Tanskys had failed to complete the conditions precedent contained in paragraph IX of the agreement, namely the 100-for-1 stock split and the transfer of majority ownership to Tom Tansky. We disagree.
A condition precedent is an act or event which must exist or occur before a duty to perform a promised performance arises. J. Calamari, J. Perillo, Contracts (1987), 439, Section 11-15. In this case, paragraph IX of the agreement sets forth additional terms for the sale of the stock, but those terms did not have to take place before Aldahan could exercise his option and become a ten percent owner of TST. First, the language concerning the 100-to-1 stock split was merely suggested and not mandatory. Although it might be awkward to transfer 9.4 shares of stock to Aldahan, the stock split was not a necessary event that had to occur before Aldahan could exercise his option. Second, although the agreement specified that, "[p]rior to sale to Aldahan John P. Tansky will sell 101 shares of his stock to Thomas Tansky," the transfer of 101 shares of John Tansky's stock to Tom Tansky was merely an additional term of the agreement, not a condition precedent to Aldahan exercising the option. Failure to transfer majority control to Tom Tansky was not an event that had to take place before Aldahan could proceed to exercise his option. If, on January 2, 1997, John Tansky had sold ten percent of the stock to Aldahan and had not given majority control to Tom Tansky, Tom Tansky would have had a claim for breach of contract against John Tansky, but the sale to Aldahan could still have proceeded. Likewise, if Aldahan had tendered part of the purchase price to John Tansky on January 2, and John Tansky had refused to transfer the stock, Aldahan would have had a claim for breach of contract against John Tansky that he could seek to have specifically enforced regardless of the failure to transfer majority control to Tom Tansky. Contracts may be specifically enforced after the option is exercised and the other party refuses to comply.Toebben v. Campbell (1970), 25 Ohio App.2d 123. The only condition that triggered a duty on the part of John Tansky to sell ten percent of the shares was Aldahan exercising the option on January 2, 1997, for $910,000 cash or a portion of the $910,000 in cash.
Finally, Aldahan argues the transfer of majority control to Tom Tansky had to be completed prior to the sale to Aldahan, as any change in ownership of the dealership required prior written permission of Toyota USA. Thus, if Toyota USA failed, for any reason, to approve the transfer of majority ownership to Tom Tansky, the dealership could lose its franchise and the stock would be nearly worthless. What Aldahan overlooks is that the Toyota Dealer Agreement signed by John Tansky that required prior written permission for a change in ownership specifically authorized Aldahan to become a ten percent owner of TST and did not specify from whom the ten percent had to come. (Defendant's Exhibit 16, at 3.) Thus, if for some reason Toyota failed to approve the transfer of majority control to Tom Tansky, Aldahan would still be a ten percent owner of TST.
Accordingly, the plain unambiguous language of the contract required Aldahan to tender at least a portion of the purchase price on January 2, 1997, in order to exercise his option to purchase ten percent of the dealership stock. The provisions contained in paragraph IX of the contract were not conditions precedent to Aldahan's duty to tender payment if he wanted to exercise the option. The verdict in favor of Aldahan and against John Tansky in the amount of $818,620 for failure to transfer stock must be reversed, and judgment entered for the estate of John Tansky.
Appellants next argue that the $787,517 verdict against TST for breach of contract must be vacated. Appellants argue that none of the jury's award for breach of contract against TST could be for failure to transfer stock, as any contractual obligation to transfer ten percent of the corporate stock was solely that of John Tansky. Thus, when the jury returned a verdict in favor of Aldahan and against appellants on the breach of contract claims, only John Tansky could be liable for refusal to sell stock.
Aldahan argues that TST should be liable for damages for failure to transfer stock because the damages for the breach must come from the corporation since the only value of the stock is the earnings that would be paid to shareholders based on their ownership in the Subchapter S Corporation. Since the stock must be sold back at cost under the contract, Aldahan calculated his damages based on the percentage of earnings represented by stock less the cost of borrowings to buy the stock. Aldahan argues the jury logically concluded that those damages should be shared fifty-one percent by John Tansky and forty-nine percent by the corporation which reflected John Tansky's ownership interest. (Aldahan brief at 13.) We disagree.
If, as Aldahan contends, the award of $786,517 was for failure to transfer stock, the entire $786,517 verdict must be set aside because: (1) Aldahan did not exercise his option to purchase the stock; and (2) TST never had any contractual obligation to sell stock to Aldahan that it never owned.
Appellants acknowledge that the jury could have awarded at least some of the damages for breach of contract by TST to compensate Aldahan for salary underpayments. Since, by Aldahan's own calculations, he claimed only $229,802 for that alleged breach ($130,428 for salary underpayments and $99,374 for the ninety-day period following his discharge) appellants contend the trial court erred in not vacating the award.
At trial, Aldahan claimed appellants breached the contract in a number of ways:
1. By refusing to transfer stock to him;
 2. By failing to provide him with 90-days notice of his termination;
3. By failing to pay him for the 90-day period; and
 4. By failing to pay him his total compensation for his period of employment between his time of hire in 1993 and his termination on November 4, 1997, and beyond. [See Tr. VIII, at 19.]
At trial, Aldahan requested damages of $5,616,115 (less mitigation and plus underpayments of $130,428) for lost compensation. Included in the claim for lost compensation was a claim for $99,374 in damages for the ninety-day period following his discharge.[1] Aldahan argues any damages for the ninety-day period and underpayment of monthly compensation were included in the wrongful termination award. If true, the entire $786,517 award must be set aside as it only represents damages for sale of stock.
However, it is not clear from the jury's verdict forms whether damages for the ninety-day period and for underpayment of monthly compensation were included in the breach of contract award against TST or the award for wrongful termination. As the jury was instructed, they could award damages for these items under a breach of contract theory, $229,802 of the $786,517 award against TST may have been for underpayment of monthly compensation and the ninety-day period. Thus, the trial court erred in not vacating the $786,517 award against TST and entering judgment for only $229,802.
Appellants next argue that the $2,349,204 verdict against TST for wrongful termination must be vacated, as the damages claim for lost income as an employee was predicated solely on factually inaccurate, speculative, and unsubstantiated estimates of TST's yearly net profits for the ten years following Aldahan's termination.
Aldahan's damage calculations were based in part on the premise that he would have continued to receive 22.5 percent of the net profits of the dealership over the next ten years. Lost profits may be recovered in a breach of contract action if profits were within the contemplation of the parties at the time the contract was made, the loss of profits is the probable result of the breach of contract, and the profits are not remote and speculative and may be shown with reasonable certainty. CharlesR. Combs Trucking, Inc. v. International Harvester Co. (1984),12 Ohio St.3d 241, paragraph two of the syllabus. In order to prove lost profits to a reasonable certainty, Aldahan had to provide an evidentiary foundation to support his calculations.
Appellants argue that Aldahan grossly overstated profits for the years 1997 and 1998, by using estimated figures instead of using the actual profit figures for the dealership. Appellants claim that Aldahan then used unsubstantiated estimates of ten percent annual increases in profits for the years 1998 through 2001, and unsubstantiated estimates of five percent annual increase in profits for the year 2002 and beyond. Appellants claim that Aldahan failed to back up any of his estimated figures by expert testimony, and that his estimates of profits were mere conclusory statements.
Based on our review of the record, we find that Aldahan did provide an evidentiary foundation to support his damage calculations. At trial, Aldahan testified that, for 1997, the year he was terminated, he could only vouch for figures through September 1997 while he was still employed. He then annualized that figure to arrive at a projected profit for 1997. (Tr. Vol. II, at 102.) This figure was higher than the actual TST financial reports for that year. However, Aldahan also testified that the Tanskys bulked up expenses immediately after his termination in order to affect profit figures. (Tr. Vol. II, at 103-107.) In the first four years of his employment, Aldahan oversaw increased profits in the range of fifty-to-sixty percent. However, Aldahan only projected profit increases of five-to-ten percent over the next ten years. Aldahan explained the basis for his projections of a ten percent increase of profits for the first five years after his termination and a five percent increase for the next five years based on Toyota's market penetration and decision to enter the full-size pickup truck market. (Tr. Vol. II, at 107-112.) Given Aldahan's testimony, we find that he provided a sufficient evidentiary foundation to support his calculations.
Appellants also argue that Aldahan understated the income that he could have earned in mitigation by at least $342,000. In calculating the amount he earned in mitigation, Aldahan used an annual salary figure of $144,000 — the amount of his current salary as part owner of the Toyota on the Heights dealership in Cleveland. Upon his termination, Aldahan initially accepted a position with the Kelly Group in Florida paying $180,000 per year plus a percentage of the dealership's profits. (Tr. Vol. III, at 6.) However, the position with the Kelly Group did not include an ownership opportunity. Aldahan left that job to pursue an opportunity to become an owner of a dealership. When that opportunity failed to materialize, Aldahan found other employment that paid less than his job with the Kelly Group but with the opportunity to become an owner of the dealership. Appellants assert that, when Aldahan left the position with the Kelly Group, he failed to use ordinary effort to mitigate damages, and the amount he would have earned had he not quit that position was deductible from the damages awarded for wrongful termination.
Aldahan argues that the position that he accepted with the Kelly Group did not constitute comparable employment to the position he was promised by the Tanskys, as there was no opportunity to become an owner of the Kelly Group dealership. The Tanskys had promised Aldahan an ownership opportunity with their dealership. Thus, a position that paid him a salary plus a percentage of the profits was not comparable employment to an ownership interest.
In Worrell v. Multipress, Inc. (1989), 45 Ohio St.3d 241, the court stated that the usual remedy in a breach of contract case for wrongful discharge is to pay the injured party the difference between any wages due under the contract from the date of discharge until the contract term expires. That amount is to be reduced by any wages the employee earned in subsequent employment. See, also, State ex rel. Guerrero v. Ferguson (1981),68 Ohio St.2d 6. A party seeking to recover such compensation is required to mitigate damages; however, a wrongfully discharged employee need only accept similar employment in mitigation. Stateex rel. Wilcox v. Woldman (1952), 157 Ohio St. 264. The party must use ordinary care to obtain similar employment and the employee's exercise of due diligence should be considered in light of available employment opportunities. James v. Allen County
(1886), 44 Ohio St. 226; See Willson v. Board of Trustees of TheOhio State University (Dec. 24, 1991), Franklin App. No. 91AP-144, unreported (the only comparable employment, head gymnastics coach at the intercollegiate level, was at Michigan State University and the United States Naval Academy). Moreover, the employer has the burden of proof on the issue of mitigation of damages. State exrel. Martin v. Columbus (1979), 58 Ohio St.2d 261.
In this case, we find that the position with the Kelly Group was a comparable position. Aldahan argued that he was promised both the position as general manager and the opportunity to obtain equity ownership in the dealership. Since Aldahan did not exercise his option to become an equity owner of TST, his basis for recovery was limited to that of the promise of continued employment as a general manager. Thus, Aldahan's employment with the Kelly Group earning a base of $15,000 per month plus a percentage of the profits was comparable employment to his position as general manager of TST earning a percentage of the net profits. The trial court erred in not vacating the damages award as Aldahan understated the amount of income he could have earned in subsequent employment by $342,000.
Accordingly, the first assignment of error is sustained in part and overruled in part. The $818,620 judgment against John Tansky for breach of contract for failure to transfer stock must be vacated and judgment entered in favor of the estate of John Tansky on that claim. The $786,517 award against TST must be set aside and judgment entered in favor of Aldahan for $229,802. The $2,349,204 verdict against TST must be set aside and judgment entered in favor of Aldahan for $2,007,204.
In their second assignment of error, appellants argue it was error for the trial court to admit parol evidence and to permit the jury to interpret clear and unambiguous terms of the December 3, 1996 agreement. Appellant argues that, as a result of the erroneous admission of parol evidence, the jury mistakenly concluded: (1) that Aldahan had no obligation to pay all or any part of the $910,000 to exercise the option on January 2, 1997; (2) that Aldahan had a ten year employment contract with TST; (3) that Aldahan could only be fired for cause; and (4) that TST breached the employment contract by terminating Aldahan without cause before the expiration of the ten year term, even though the plain language of the agreement contains no such terms.
When a term of a contract is ambiguous, the parol evidence rule does not bar the admission of statements and evidence to help interpret the agreement. In such a case, parol evidence is admissible. Schleicher v. Alliance CorporateResources, Inc. (Dec. 7, 1995), Franklin App. No. 95APE03-311, unreported.
As discussed above, under the clear and unambiguous language of the December 3 agreement, Aldahan was not under any obligation to pay all or any part of the $910,000 on January 2, 1997, but, unless he tendered payment, John Tansky was under no obligation to transfer the stock to Aldahan. Thus, parol evidence at variance with those terms was inadmissible.
We also agree that, nowhere in the December 3 agreement, is there a promise of employment for ten years. However, the promises of a ten-year term of employment relate to Aldahan's separate claim for promissory estoppel and, therefore, evidence that Aldahan was promised employment for that length of time was admissible, not as parol evidence to vary the terms of an express written contract, but to support his promissory estoppel claim. For example, there was evidence in the 1995 Dealer Agreement that John Tansky intended to allow Aldahan to purchase stock over a ten-year period. (See Defendant's Exhibit 16, at 5.) Also, based on assurances Aldahan received from Tom Tansky, Aldahan believed his employment was secure for ten years as set out in the 1995 Toyota Dealer Agreement.
The trial court also admitted parol evidence on the issue of whether the parties contemplated in the December 3 agreement that Aldahan could be terminated, at will, provided that he be given ninety-days notice, or whether the parties intended that appellants have cause for terminating Aldahan in addition to having to give him ninety-days notice. (See Jury Instructions Tr. VIII, at 21-22.) Paragraph V of the December 3 agreement required the parties to perform certain acts in the event of "[t]ermination of employment due to death, disability or other reasons." Aldahan argued the term "other reasons" could only mean substantial health-related reasons similar to death or disability. Thus, Aldahan argues, the agreement not only contemplated termination for cause only, but it anticipated that the cause must be death, disability or other reasons. Appellants argued that the term "other reasons" meant "any reasons" and, therefore, the agreement was at-will. The trial court held that the term "other reasons" could mean anything and was, therefore, ambiguous.
We agree that paragraph V of the agreement was ambiguous. Therefore, the jury was entitled to hear parol evidence to aid in their duty to ascertain the intent of the parties on the issue of whether or how the December 3 agreement altered the reasons for which Aldahan could be terminated.
Aldahan testified that, based on conversations with Tom Tansky, he understood that, as long as he was performing well as general manager, he could only be terminated if he committed fraud or theft, or misappropriated funds. (Tr. Vol. III, at 7.) Aldahan's testimony did not alter the terms of the written agreement. Rather, the evidence was admitted to allow the jury to give effect to the intention of the parties. As such, it was not error for the trial court to admit the evidence. Accordingly, the second assignment of error is sustained as it relates to parol evidence with respect to the sale of stock claim, but is not well-taken in the other respects.
In their third assignment of error, appellants argue that the trial court erred in instructing the jury to consider Aldahan's claim of wrongful termination as an independent cause of action. Appellants make essentially two arguments. First, the instruction as to wrongful termination as a separate claim was erroneous because there is not an independent cause of action for wrongful termination in Ohio. Second, even if the wrongful termination claim was derivative of the breach of contract and promissory estoppel claims, Aldahan could not prove either breach of contract or promissory estoppel as a matter of law.
Appellants are correct that there is no separate cause of action for wrongful termination in Ohio. Here, the trial court specifically instructed the jury that:
 * * * Plaintiff's wrongful termination claim is a derivative of his breach of contract claim and his promissory estoppel claim.
In other words, if you conclude that the Plaintiff was wrongfully terminated by the Defendants in violation of either the oral promises that the Defendants made to him or by virtue of the terms of their written contract, then you would award damages under the same standards with respect to the contract and promissory estoppel claims that I've already given you. [Tr. Vol. VIII, at 33.]
The jury was also specifically instructed that damages for a particular injury caused by appellants' conduct could only be awarded once. (Tr. VIII, at 34.) By its answers to the interrogatories, it appears that the jury found for Aldahan on both his breach of contract and promissory estoppel claims but, in accordance with the trial court's instructions, assessed damages on only one claim — breach of contract.
We see no prejudicial error in the instructions on wrongful termination. The jury was instructed that TST, through its officers John and Tom Tansky, made representations to Aldahan to secure his services as general manager of TST. A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine. Mers v.Dispatch Printing Co. (1985), 19 Ohio St.3d 100. However, a party is not entitled to a double recovery by utilizing the alternative claim of promissory estoppel. Schleicher, supra. Nevertheless, a party may still plead and present both theories to the trier of fact. Id.
With respect to Aldahan's at-will status, appellants argue that Aldahan, as an at-will employee, could not be wrongfully terminated. As discussed above, we agree with the trial court that a factual dispute existed as to whether Aldahan was an at-will employee or whether his at-will status was modified by the December 3, 1996 agreement. This created a jury question as to whether TST breached the agreement by terminating Aldahan without cause. Moreover, at-will agreements may be either oral or written. Id. The jury also heard testimony that Aldahan had been promised that he could only be fired for theft, fraud or misappropriation of funds.
Finally, appellants argue that Aldahan failed to prove his promissory estoppel claim as he failed to establish the elements of actual reliance on appellants' promises and injury. Appellants argue that, even after he signed the December 3 agreement, Aldahan did not believe the Tanskys were actually going to follow through with their promises of equity ownership. Appellants also claim that Aldahan was not relying on Tom Tansky's promises when he abandoned another business opportunity to buy a dealership and purchased an expensive home.
In order to establish the reliance element of his claim for promissory estoppel, Aldahan was required to establish that his employer's promise actually induced action or forbearance on the part of the employee. See Kelly v. Georgia-Pacific Corp.
(1989), 46 Ohio St.3d 134, paragraph three of the syllabus. (See, also, Jury Instructions Tr. Vol. VIII, at 29.) Here, although there may have been evidence to the contrary, there was also evidence from which the jury could find that, immediately after receiving certain assurances from the Tanskys, Aldahan committed to buy an expensive home and abandoned other business opportunities to purchase a dealership. Accordingly, the third assignment of error is not well-taken.
Based on the foregoing, appellants' first assignment of error is sustained in part and overruled in part. The second assignment of error is sustained with respect to the admission of parol evidence on the issue of the paragraph III of the agreement, but overruled with respect to the other areas of the agreement the trial court held were ambiguous. The third assignment of error is overruled. The $818,620 judgment against John Tansky for breach of contract for failure to transfer stock must be vacated and judgment entered in favor of the estate of John Tansky on that claim. The $786,517 award against TST must be set aside and judgment entered in favor of Aldahan for $229,802. The $2,349,204 verdict against TST must be set aside and judgment entered in favor of Aldahan for $2,007,204.
Accordingly, the judgment of the Franklin County Court of Common Pleas is reversed in part and affirmed in part and this cause is remanded to the trial court for further proceedings in accordance with this opinion.
BRYANT and KENNEDY, JJ., concur.
[1] Using plaintiff's Exhibit 10, the "Individual Damage Calculation Worksheet," Aldahan's compensation for the ninety-day period following his November 4, 1997 termination can be calculated as follows: Aldahan calculated his total compensation as general manager at 22.5% for 1997 = $384,674. 2/12 of that figure for November and December = $64,112.33. Total compensation for 1998 at 22.5% = $423,141. 1/12 of that figure for January = $35,261.75. Adding the November, December, and January figures results in a total for the ninety-day period of $99,374.08.